**AM INTERNATIONAL, INCORPORATED, Plaintiff–Appellant,**

v.

**GRAPHIC MANAGEMENT ASSOCIATES, INCORPORATED, Defendant–Appellee.**

No. 94–2397.

United States Court of Appeals, Seventh Circuit.

Argued Oct. 27, 1994.

Decided Jan. 6, 1995.

Michael T. Hannafan (argued), William E. Blais, Cory A. Johnson, Hannafan & Associates, Chicago, IL, for plaintiff-appellant.

Thomas F. Ging, Thomas Crisham, Hinshaw & Culbertson, Chicago, IL, Stephen J. Springer (argued), Joseph L. Turchi, Labrum & Doak, Philadelphia, PA, for defendant-appellee.

Before POSNER, Chief Judge, and ESCHBACH and RIPPLE, Circuit Judges.

POSNER, Chief Judge.

This diversity breach of contract suit, governed by Illinois law, was brought by AM International ("AM" for short) against Graphic Management Associates (GMA). The district judge entered judgment on the pleadings for GMA. Fed.R.Civ.P. 12(c); 836 F.Supp. 487 (N.D.Ill.1993). The appeal raises surprisingly fundamental questions of contract law.

Both parties are manufacturers of printing machines used in the newspaper business. One of these machines is called a "newspaper inserting machine," and it comes equipped with what is called a Missed Insert Repair System (MIRS). These are complicated and expensive machines, which must be customized to the purchaser's specifications. AM brought a suit against GMA, charging that GMA's newspaper inserting machines with MIRS infringed a patent of AM's. The case was settled on December 27, 1988. The settlement included a license agreement, effective the same day, which entitled AM to a royalty of $200,000 on each MIRS-equipped newspaper inserting machine made by GMA and "shipped after ... [Dec. 27, 1988] and before the expiration of" the patent, which was to expire on July 23, 1991. But there was an exception: "beginning on January 1, 1991 and continuing to July 23, 1991 [the date of the expiration of the patent] royalty shall accrue on the receipt by GMA of a *bona fide* purchase order for a product, provided that product is shipped prior to December 31, 1991."

In January 1990, the owner of the *Philadelphia Inquirer* ordered nine MIRS-equipped machines from GMA. Four were not shipped until after December 31, 1991, and AM concedes that no royalty is due on any of those machines. The other five machines were shipped between September and November of 1991, and thus before December 31, and as to those AM contends that royalty is due. The district judge disagreed, thinking the contract too clear against AM's contention to allow the taking of parol evidence to determine the parties' true intentions. The judge did, however, mention some of that evidence, which had been obtained in discovery before GMA moved for judgment on the pleadings, en route to his conclusion that the evidence was inadmissible to alter the apparent meaning of the contract.

When judges say that a contract is "clear on its face," they mean simply that an ordinary reader of English, reading the contract, would think its application to the dispute at hand certain. That describes this case to a T. AM is entitled to royalties on machines shipped by GMA before July 23, 1991, unless the purchase order was received between January 1 and July 23, in which event AM is entitled to royalties on machines shipped by GMA until December 31. The purchase order for the five machines in issue was received before January 1, so the exception did not come into play, and therefore AM would have been entitled to royalties on the machines only if they had been shipped before July 23, which they were not.

The text contains no clue that the contract might mean something different from what it says. GMA says that that is the end of the case; and there is plenty of judicial language, from Illinois cases as from cases from other states, that if the language of a contract appears to admit of only one interpretation, the case is indeed over. E.g., *Omnitrus Merging Corp. v. Illinois Tool Works, Inc.*, 256 Ill.App.3d 31, 195 Ill.Dec. 701, 704, 628 N.E.2d 1165, 1168 (1993); *In re Marriage of Osborn*, 206 Ill.App.3d 588, 151 Ill.Dec. 663, 668, 564 N.E.2d 1325, 1330 (1990). This is the "four corners" rule. AM ripostes that the doctrine of "extrinsic ambiguity" entitled it to present evidence that although the contract appears to be clear, anyone who understood the real-world context would know that it does not mean what it seems to mean. And there are many cases which say this, too. E.g., *USG Corp. v. Sterling Plumbing Group, Inc.*, 247 Ill.App.3d 316, 186 Ill.Dec. 830, 832, 617 N.E.2d 69, 71 (1993); *Economy Preferred Ins. Co. v. Jersey County Construction, Inc.*, 246 Ill.App.3d 387, 186 Ill. Dec. 233, 235, 615 N.E.2d 1290, 1292 (1993). Can these lines of cases be reconciled? If so, how? If not, how are we to decide this case?

Rules of law are rarely as clean and strict as statements of them make them seem. So varied and unpredictable are the circumstances in which they are applied that more often than not the summary statement of a rule—the terse formula that judges employ as a necessary shorthand to prevent judicial opinions from turning into treatises—is better regarded as a generalization than as the premise of a syllogism. Take the rule that if a contract is clear on its face, the court will not permit the taking of evidence to contradict that "clear" meaning. The famous contract in *Raffles v. Wichelhaus,* 2 H. & C. 906, 159 Eng.Rep. 375 (Ex.1864), which we have revisited twice in recent cases, *Miller v. Taylor Insulation Co.,* 39 F.3d 755, 760 (7th Cir.1994); *Colfax Envelope Corp. v. Local No. 458-3M,* 20 F.3d 750, 752–53 (7th Cir. 1994), was clear on its face. It called for the shipment of a specified amount of cotton from one port to another on the ship *Peerless.* Clear as a bell. Only there were two (if not more) ships *Peerless,* and it was impossible to tell which one the contract referred to. The contract was unclear because clarity in a contract is a property of the correspondence between the contract and the things or activities that it regulates, and not just of the semantic surface.

Take another example. Suppose the parties to the contract in *Raffles* had been members of a trade in which the term "cotton" was used to refer to guncotton rather than to the cotton used in textiles. The ordinary reader of English would not know about this special trade usage, and so would suppose the contract unambiguous. Again, the ambiguity is in the reference, that is, the connection between the word and the object that it denotes.

■ There has to be a means by which the law allows these surfaces to be penetrated, but without depriving contracting parties of the protection from the vagaries of judges and juries that they sought by reducing their contract to writing. A review of the doctrines that allow this penetration of semantic surfaces suggests that the key is the distinction between what might be called "objective" and "subjective" evidence of ambiguity. We use these terms informally, rather than with any approach to philosophical precision. By "objective" evidence we mean evidence of ambiguity that can be supplied by disinterested third parties: evidence that there was more than one ship called *Peerless,* or that a particular trade uses "cotton" in a nonstandard sense. The ability of one of the contracting parties to "fake" such evidence, and fool a judge or jury, is limited. By "subjective" evidence we mean the testimony of the parties themselves as to what they believe the contract means. Such testimony is invariably self-serving, being made by a party to the lawsuit, and is inherently difficult to verify. "Objective" evidence is admissible to demonstrate that apparently clear contract language means something different from what it seems to mean; "subjective" evidence is inadmissible for this purpose. AM relies on our decision in *FDIC v. W.R. Grace & Co.,* 877 F.2d 614 (7th Cir.1989), the principal case in this court dealing with extrinsic ambiguity and a case in which we were, as here, interpreting Illinois law, but overlooks our observation that "the nature of the offer of proof to show an [extrinsic] ambiguity is ... critical." *Id.* at 622. We said that "a self-serving statement ... that a party did not understand the contract to mean what it says (or appears to say) will not suffice"; only "an offer to show that anyone who understood the context of the contract would realize it couldn't mean what an untutored reader would suppose it meant will [suffice]." *Id.* at 622.

■ There is a further screen to protect the parties from the uncertainties of trial. Objective evidence claimed to show that an apparently clear contract is in fact ambiguous must be presented first to the judge, and only if he concludes that it establishes a genuine ambiguity is the question of interpretation handed to the jury. *Riney v. Weiss & Neuman Shoe Co.,* 217 Ill.App.3d 435, 160 Ill.Dec. 375, 379–80, 577 N.E.2d 505, 509–10 (1991); *Design Studio Int'l, Inc. v. Chicago Title & Trust Co.,* 185 Ill.App.3d 797, 133 Ill.Dec. 728, 731, 541 N.E.2d 1166, 1169 (1989).

■ There are exceptions to the rule that only objective evidence can be used to alter the meaning of a clear contract, but

they are consistent with the underlying principle. If the parties agree to an idiosyncratic meaning, the court will honor their agreement. *Skycom Corp. v. Telstar Corp.*, 813 F.2d 810, 814–16 (7th Cir.1987). (There is an analogy to the doctrine that an admission can take a case out of the Statute of Frauds. *DF Activities Corp. v. Brown*, 851 F.2d 920, 923 (7th Cir.1988).) Or if one party charges fraud, the court will go behind the face of the contract—but it will require the party to prove fraud by clear and convincing evidence, *Hofmann v. Hofmann*, 94 Ill.2d 205, 68 Ill. Dec. 593, 600, 446 N.E.2d 499, 506 (1983), thus imposing a heightened standard of proof, a device analogous to requiring objective evidence. Similarly, a party claiming an oral modification or waiver may be required to back up his claim with proof of reliance, in order to give the claim greater credibility. *Wisconsin Knife Works v. National Metal Crafters*, 781 F.2d 1280, 1287–88 (7th Cir. 1986).

■ So far, so good; but when one speaks in a diversity case of rules of contract law such as the parol evidence or "four corners" rules that erect *procedural* obstacles to a party's efforts to avoid being bound by the words of his contract, questions can arise concerning the seam between the doctrine of *Erie R.R. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), and the dictates of the Seventh Amendment. Are these "substantive" rules because of their effect on the behavior of contracting parties outside the courtroom—on their decision how to structure their relations (whether even to have contractual relations), what forms of words to use in their written contracts (whether even to have a written contract), and so on? Or are they "procedural" rules because they involve the relation between judge and jury, governed in federal courts by the Seventh Amendment? If they were treated as procedural rules, a substantial wedge would be driven between state contract cases and federal diversity contract cases. So it comes as no great surprise that rules of contract *interpretation,* such as the parol evidence and four-corners rules, are deemed substantive, because of their effect on the conduct of contracting parties outside the courtroom, even though the rules operate through limiting the kinds of evidence that are admissible. *Coplay Cement Co. v. Willis & Paul Group,* 983 F.2d 1435, 1438 (7th Cir.1993); *Zell v. American Seating Co.,* 138 F.2d 641, 643–45 n. 17 (2d Cir.1943), rev'd on other grounds, 322 U.S. 709, 64 S.Ct. 1053, 88 L.Ed. 1552 (1944). No doubt suspicion of juries plays a role in the doctrines that limit the admissibility of evidence by which a party seeks to avoid the consequences of his written words; but the rules do not differentiate between judge and jury; they bind the former as much as the latter.

■ The rule that a claim of extrinsic ambiguity is to be "screened" by the judge before being submitted to the jury—the rule of the two Illinois cases that we cited earlier, *Riney* and *Design Studio*—is different. That is a rule about the division of functions between judge and jury, and in federal court that division is governed by the Seventh Amendment rather than by state law. So we held with specific reference to the division of functions between judge and jury in diversity contract cases in *Coplay Cement Co. v. Willis & Paul Group, supra,* 983 F.2d at 1438; and for the general principle see *Mayer v. Gary Partners & Co.,* 29 F.3d 330 (7th Cir.1994). But these cases did not involve a state procedural rule *limited to a particular field of law,* such as contract law, and arguably motivated by substantive rather than procedural concerns, as in this case and *Harbor Ins. Co. v. Continental Bank Corp.,* 922 F.2d 357, 364 (7th Cir.1990). There we left open the question whether the "mend the hold" doctrine, another procedural doctrine of contract law (it forbids a party to a contract to take inconsistent litigating positions concerning the contract's meaning), is substantive or procedural for purposes of the *Erie* doctrine. We need not decide the like issue in the present case either. The rule that the judge must be satisfied that extrinsic evidence creates a genuine ambiguity before he can submit the dispute over the contract's meaning to the jury is a sensible rule, and if not bound to follow it under *Erie* we can still adopt it as a rule of federal common law to guide procedure in diversity breach of contract suits. We need not consider the extent to which it is already implicit in Rule 56 of the Federal

Rules of Civil Procedure (summary judgment). There is a sense in which a motion for summary judgment requires the judge to "screen" the evidence in advance of trial to make sure it creates a genuine issue of material fact.

The principle that allows the court in some but not all cases to search beneath the semantic surface for clues to meaning is not limited to contract cases. Even the strongest devotees of the "plain meaning" rule of statutory interpretation, a rule that resembles the "four corners" rule of contract law, allow it to bend when necessary to avoid absurd results. *Burns v. United States*, 501 U.S. 129, 137, 111 S.Ct. 2182, 2187, 115 L.Ed.2d 123 (1991); *Green v. Bock Laundry Machine Co.*, 490 U.S. 504, 527, 109 S.Ct. 1981, 1994, 104 L.Ed.2d 557 (1989) (concurring opinion). An absurdity in the application of the plain-meaning rule usually results from a comparison of the apparently plain meaning to the real-world setting in which the statute is to be applied. It is the same point that a clear document can be rendered unclear—even have its apparent meaning reversed—by the way in which it connects, or fails to connect, with the activities that it regulates. Discrepancy between the word and the world is a common source of interpretive problems everywhere.

■ With this understanding of the law, we can wrap up our discussion of this case in short order. AM presented no objective evidence that the contract means something different from what it seems to mean. No relevant custom or usage of the trade was tendered for the judge's consideration. There is no indication of the sort of "latent" ambiguity, resulting from uncertain reference or correspondence, that was present in the *Raffles* case. AM points out that the contract does not expressly discuss purchase orders received before January 1, 1991, and not filled till after July 23. But if a contract says "X after January 1," we hardly expect it to say "and not-X until January 1," since that is plainly implied.

AM argues that it is arbitrary—absurd— to distinguish between purchase orders received before or after January 1, 1991, when it is obvious that the parties intended AM to receive royalties on all allegedly infringing machines, and therefore on all machines made before the expiration of the patent. But that is not at all obvious, and in fact is obviously incorrect. AM concedes that no royalty was due on the four machines ordered by the owner of the *Philadelphia Inquirer* that were shipped after December 31, 1991, even if those machines happened to have been made before July 23, 1991, and therefore infringed the patent, since a valid patent excludes others from manufacturing, as well as selling, the patented device. 35 U.S.C. § 154. So not all infringing machines trigger a royalty obligation; and why should the five shipped after the expiration of the patent but before December 31 do so? If the parties, which being competitors can be assumed to be knowledgeable about the subject matter of the contract, had wanted AM to obtain royalties on *all* machines shipped before December 31, whenever ordered—which is AM's position—they could have said so in just those words. They did not; and there is no *objective* evidence that their failure to do so must be overlooked if the contact is to be enforced in conformity with the parties' intentions when they signed it. Although the January 1, 1991, cut-off date for GMA's obligation to pay royalties on infringing machines is arbitrary, as all such temporal lines are, it is not absurd that there should have been a cut-off date. The obvious reason for extending the royalty expiration date from the patent expiration date to some months later was to discourage GMA from delaying shipment in order to escape having to pay the royalty, which was sizable. The danger of strategic delay would be less acute for orders that GMA received long in advance of the expiration of AM's patent—orders received, for example, before January 1, 1991. Customers will not wait indefinitely for the delivery of the goods that they order, and GMA would be unlikely, therefore, to delay shipment on orders received before 1991 until after the expiration of the patent in late July. The more acute danger was manipulation of the shipment date of last-minute orders, so a cut-off date was chosen that in effect extended the final royalty expiration date for last-minute orders only.

This interpretation of the reason for the January 1, 1991, cut-off date is conjecture.

But it shows that interpreting the contract in accordance with its actual language does not produce absurd results. It thus underscores AM's failure to present objective evidence that the apparent clarity of the contract is an illusion. Without such evidence, the interpretation of the contract presents a question of law, for the judge to decide (not ignoring context, *Florida East Coast Ry. v. CSX Transportation, Inc.*, 42 F.3d 1125, 1129 (7th Cir.1994), but ignoring disputed evidence), and judgment on the pleadings is therefore appropriate.

So when GMA, after discovery was completed, moved for judgment on the pleadings on the ground that the contract was unambiguous, AM was required to demonstrate the existence of objective evidence that the contract was not so clear as it seemed to be. In its brief in opposition to GMA's motion for judgment on the pleadings, AM argued that there was evidence demonstrating an extrinsic ambiguity, tendered that evidence in the form of affidavits, and asked the district judge to convert GMA's motion into a motion for summary judgment and deny the recharacterized motion on the ground that there was a genuine issue of material fact concerning the meaning of the contract, precluding summary judgment. Fed.R.Civ.P. 12(c). This was a proper procedure for AM to follow. *Sanchez v. United States*, 813 F.2d 593, 594 (2d Cir.1987); *Homart Development Co. v. Sigman*, 868 F.2d 1556, 1561–62 (11th Cir.1989); cf. *Dubied Machinery Co. v. Vermont Knitting Co.*, 739 F.Supp. 867, 870 (S.D.N.Y.1990). But its affidavits do not create a factual issue concerning the existence of an extrinsic ambiguity. The strongest of them is the affidavit of a patent expert who opined that "In my 30 years of patent practice, I have never seen, handled or heard of a patent license in which there was a royalty exclusion window [of the kind suggested by GMA]." What does that prove? That such a provision is unusual? That AM was fooled? It is not evidence that the parties were employing a special vocabulary, so that the meaning of the contract is opposite to what an outsider would think. It is not the sort of evidence that would authorize a jury to ignore the language of the contract. So the judge was right to grant GMA's motion, though he should have said that he was ruling on a motion for summary judgment, because the propriety of granting the motion depended on a determination that AM's affidavits did not create a genuine issue of material fact.

AM would have a legitimate complaint if the judge had granted summary judgment (whether in form or in substance) without giving AM due notice that a motion under Rule 12(c) was being treated as a Rule 56 motion. See Fed.R.Civ.P. 56(c); *United States v. Gutierrez*, 839 F.2d 648, 651 (10th Cir.1988). But it was AM itself that wanted the conversion, and it does not suggest that it has any evidence that it was not permitted to put before the judge when he was considering its response to GMA's motion.

AM also complains about the judge's having refused to allow it to amend its complaint to allege that the January 1990 purchase order had been modified after January 1, 1991, and that the modification should be deemed a new purchase order, coming within the exception in the contract. The judge's ruling was correct, indeed unavoidable. The "modification" was no such thing; it was an internal document of GMA's, dated April 1991, which merely records the nine machines as still being on order by the purchaser. AM itself describes it as a "re-order" or "confirmation." The machines would be "on order" until the day they were delivered, and a notation to that effect would not be a purchase order but merely a status report.

There is no point in granting a motion to amend a complaint if the amendment would not cure the infirmity that caused the original complaint to be dismissed. The standard formula is that it not an abuse of discretion for the district judge to deny the motion in such a case. *Wilson v. American Trans Air, Inc.*, 874 F.2d 386, 392 (7th Cir. 1989). The point can be put more strongly: a judge should not grant a motion to amend the complaint if the grant would merely set the stage for the dismissal of the amended complaint.

AFFIRMED.