Diana M. BOURKE, Jane B. Perrin, and Michael S. Geltzeiler, Plaintiffs–Appellants,

v.

The DUN & BRADSTREET CORPORATION, a Delaware corporation having its principal place of business in New Jersey, Defendant–Appellee.

No. 98–1163.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 24, 1998.

Decided Oct. 27, 1998.

Michael R. Levinson (argued), Seyfarth, Shaw, Fairweather & Geraldson, Chicago, IL, for Plaintiffs–Appellants.

Mark E. Ferguson (argued), Adam L. Hoeflich, Bartlit, Beck, Herman, Palenchar & Scott, Chicago, IL, for Defendant–Appellee.

Before CUMMINGS, BAUER, and DIANE P. WOOD, Circuit Judges.

CUMMINGS, Circuit Judge.

This diversity case concerns an issue of contract interpretation to be decided under Illinois law. Diane M. Bourke, Jane B. Perrin, and Michael S. Geltzeiler allege that their former employer, Dun & Bradstreet Corp. ("D & B"), owes them money under a contractual incentive compensation plan. They sued D & B for breach of contract, violation of the Illinois Wage Payment and Collection Act, 820 Ill. Comp. Stat. 11511, *et seq.*, and unjust enrichment. At issue was whether the applicable provision of the contract could be interpreted to support their claims. Finding that it could not, the district court held that the first two counts failed to state a claim on which relief could be granted, Fed. R. Civ. Pro. 12(b)(6), and that the third was therefore barred by state law. Accordingly, it dismissed Bourke's, Perrin's, and Geltzeiler's case with prejudice on the briefs. *Bourke v. Dun & Bradstreet Corp.*, No. 97–C–4981, 1998 WL 25166 (N.D.Ill., Jan.9, 1998). Bourke and her fellow plaintiffs appealed. We affirm.

I. Background

Bourke, Perrin, and Geltzeiler were employees and officers of some D & B subsidiaries, including NCH Promotional Services ("NCH"). D & B underwent a reorganization in November 1996, splitting into three separate companies. Appellants' employment contract included an incentive compensation plan, the Key Employees Performance Plan (the "Plan"), the terms and application of which are at issue here. The Plan gave covered employees the opportunity to earn a great deal of money in the form of "performance units." These units had greater or lesser value depending on, among other things, participants attaining certain perfor-

mance criteria and targets within an award period. Appellants' targets were specified in individual grant letters. The letters stated that participants' performance units would be paid out at the end of an award period under different bonus levels, described as "floor," "target," or "200% payout." The letters also say that "additional bonus opportunity exists beyond the 200% mark."

The Plan also provided that if a subsidiary underwent a "change in control," such as a reorganization, its beneficiaries would nonetheless receive some payment. Precisely how much is the point of contention in this case. The key language, § 6(a) of the Plan, says that upon a change in control, "[Performance] Units held by [a Plan participant] ... shall immediately become payable in full, with the final value of such units determined as though performance criteria and targets for the full Award Period had been achieved." It is undisputed that D & B's reorganization was a change in control which triggers § 6(a). The question is rather whether D & B did what was required of it under the correct interpretation of the provision. That in turn depends in large part upon whether the term "target" is to be read as singular or plural.

D & B argues that the plain meaning of the contractual language is that, upon a "change in control," the performance units would be "payable in full" at the 100% "target" level no matter what. So understood, each of the several participants was given a single target. Even if a participant were to fall short of that target, his or her performance units would be paid out as if she or he had attained the target. However, the performance units would not be paid out above the 100% level, even if a participant had exceeded his or her target when the change in control occurred. On this reading, § 6(a) is a sort of safety net, providing a best worst outcome in case of a change in control while giving D & B a simple and uniform method of paying participants in case of such an event. D & B also asserts that even if the contractual language was ambiguous, the interpretation given to it by D & B's Executive Compensation and Stock Option Committee should be accorded deference under an abuse of discretion standard.

Appellants maintain that the plain meaning of the contested language is that even if a change in control occurred, their performance units would be worth as much as if no change in control had taken place. The contract says, according to them, that each participant has several targets at different payout levels, 100%, 200%, and so on. If a participant would have been entitled to a 200% or higher payout had there been no reorganization, then that person would be paid at that level despite any reorganization. That is, participants would be protected against any reduction of their individual awards due to a change in control, although they would not have been entitled to payout at the 100% level if they had not attained their 100% target. The contract would provide neither ceiling nor floor, but only accelerate whatever individual payments were already due upon occurrence of the change in control. Alternatively, appellants argue that if the language is ambiguous, ambiguities must be construed against the drafter, D & B. They wish to proceed with discovery and trial, seeking to construe the contract in view of extrinsic evidence to eliminate alleged ambiguities.

The practical difference between these positions is that under D & B's interpretation, appellants have been "paid in full" under the contract provision at $222,000, but under the appellants' reading, they would be entitled to about two million dollars collectively. Hence this litigation.

II. Analysis

■ As a preliminary matter, we note that the district court treated the case as a contract dispute rather than as one arising under ERISA. We follow this approach. For a compensation plan to come under ERISA, it must be a "plan" within the meaning of the statute. That requires, among other things, "a uniform administrative scheme, which provides a set of standard procedures to guide processing of claims and disbursements of benefits." *Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1, 9, 107 S.Ct. 2211, 2216, 96 L.Ed.2d 1; *see also Tischmann v. ITT/Sher-*

*aton Corp.*, 882 F.Supp. 1358, 1368–1369 (S.D.N.Y.1995) (discussion of what constitutes an ERISA "plan"). We do not hold that this Plan is not a "plan" under ERISA, but no showing that it is such a "plan" has been made here, since the parties did not address ERISA. We think in any case that the outcome would be the same and the analysis essentially unchanged if ERISA were to apply.

■ Contract interpretation, including the question of whether a contract is ambiguous, involves conclusions of law. The district court's determination is reviewed *de novo*, "without giving any deference to the interpretation by the first-line decider, here the district judge." *United States v. Administrative Enterprises*, 46 F.3d 670, 674 (7th Cir.1995); *see also Fuja v. Benefit Trust Life Ins. Co.*, 18 F.3d 1405, 1407 (7th Cir.1994). The law to be applied is state law under *Erie R.R. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188. In a diversity case, a federal court applies federal procedural but state substantive law. *Id.* Rules of contract interpretation are treated as substantive to avoid driving a wedge between state and federal diversity contract cases. *AM Internat'l Inc. v. Graphic Management Associates, Inc.*, 44 F.3d 572, 576 (7th Cir.1995); *Coplay Cement Co. v. Willis & Paul Group*, 983 F.2d 1435, 1438 (7th Cir.1993). In the present case, neither party disputes that the law to be applied is Illinois law.

■ Illinois uses in general a "four corners" rule in the interpretation of contracts, holding, as we have previously remarked, that "if the language of a contract appears to admit of only one interpretation, the case is indeed over." *AM Internat'l*, 44 F.3d at 574. Contracts "must be construed to give effect to the intention of the parties which, when there is no ambiguity in the terms of the [contract], must be determined from the language of the [contract] alone." *Flora Bank & Trust v. Czyzewski*, 222 Ill.App.3d 382, 164 Ill.Dec. 804, 809, 583 N.E.2d 720, 725 (1991). As the Illinois Supreme Court recently restated this rule: "The terms of an agreement, if not ambiguous, should be generally enforced as they appear, and those terms will control the rights of the parties. Moreover,

any ambiguity in the terms of a contract must be resolved against the drafter of the disputed provision." *Dowd & Dowd, Ltd. v. Gleason*, 181 Ill.2d 460, 230 Ill.Dec. 229, 239, 693 N.E.2d 358, 368 (1998) (internal citations omitted).

■ Under the Illinois "four corners" rule, the threshold inquiry is whether the contract is ambiguous. *Ford v. Dovenmuehle Mortgage Inc.*, 273 Ill.App.3d 240, 209 Ill.Dec. 573, 577, 651 N.E.2d 751, 755 (1995); *Hillenbrand v. Meyer Medical Group, S.C.*, 288 Ill.App.3d 871, 224 Ill.Dec. 540, 542, 682 N.E.2d 101, 103 (1997). Neither party here alleges ambiguity as a first line of argument. Appellants urge ambiguity in the alternative. But if the contract is not ambiguous, that will normally settle the dispute. In Illinois, "[a]n instrument is ambiguous only if the language used is reasonably or fairly susceptible to having more than one meaning, but it is not ambiguous if a court can discover its meaning simply through knowledge of those facts which give it meaning as gleaned from the general language of the contract. A contract is not rendered ambiguous simply because the parties do not agree on the meaning of its terms." *Flora Bank & Trust*, 164 Ill.Dec. at 809, 583 N.E.2d at 725 (internal citations omitted). When a contractual provision is "subject to more than one reasonable interpretation, it is ambiguous and must be construed against [the drafter]...." *Elson v. State Farm Fire & Casualty Co.*, 295 Ill.App.3d 1, 229 Ill.Dec. 334, 338, 691 N.E.2d 807, 811 (1998).

■ There are, broadly speaking, at least two kinds of ambiguity which a contractual term might involve. "Latent" or "extrinsic" ambiguity arises when the terms are clear taken by themselves, but the surrounding circumstances create inconsistent interpretations. *See, e.g.*, the famous contract in *Raffles v. Wichelhaus*, 2 H. & C. 906, 159 Eng. Rep. 375 (Ex. 1864), which specified that cotton was to be shipped aboard a ship Peerless, but did not say which Peerless— there were several. In such cases, we have held admissible objective evidence as to the circumstances which supposedly create ambi-

guity.[1] *FDIC v. W.R. Grace & Co.*, 877 F.2d 614, 622 (7th Cir.1989). Objective evidence is the sort "that can be supplied by disinterested third parties ...," *e.g.*, that there was more than one Peerless. *AM Internat'l*, 44 F.3d at 575. Subjective evidence, including the unsupported recitations of the parties as to their own understandings, we have generally held to be inadmissible. *Id.*

■ No extrinsic or latent ambiguity is alleged in the case before us. The question is rather one of "manifest" or "intrinsic" ambiguity. This arises when the express language of the contract itself is fairly susceptible to more than one reasonable reading. In that case, what the contract says is simply not clear on its face. Whether we read the language of the Plan here in dispute as ambiguous depends, therefore, entirely upon the interpretation of its contested terms. If a single definite meaning can reasonably be imputed to them, the contract is not ambiguous and its language controls.

■ Both parties here urge, as their first line of argument, that the language is unambiguous and supports their own interpretation. Both can be wrong, but both cannot be right. If we find one proposed interpretation to be reasonable, we must ascertain whether the other interpretation is likewise reasonable. If it is, that would show that "the language used is reasonably or fairly susceptible to having more than one meaning," *Flora Bank & Trust*, 164 Ill.Dec. at 809, 583 N.E.2d at 725. In that case the contract would seem, at least at first blush, ambiguous. It would also be *prima facie* ambiguous, of course, if it were not fairly susceptible to either proffered interpretation.

This would raise the question about whether the purported ambiguity could be resolved as a matter of law by the court appealing to "knowledge of those facts which give it meaning as gleaned from the general language of the contract." *Id.* At this stage, the court would also apply rules of construction like reading ambiguous language *contra proferentum* (against the drafter).

■ If ambiguity were to remain,[2] then the door would be opened to extrinsic evidence to be evaluated by a finder of fact. "Where there is an ambiguity and if, after considering the contract language in light of parol evidence and rules of construction, doubt still remains as to the meaning of the contract, then the question of interpretation must be left to the trier of fact." *Countryman v. Indus. Com'n*, 292 Ill.App.3d 738, 226 Ill.Dec. 712, 715, 686 N.E.2d 61, 64 (1997).

■ If, however, one interpretation is reasonable and the other is not, there is no ambiguity to resolve by use of canons of construction or parol evidence and there is nothing for a trier of fact to determine. Where the contract "is susceptible to only one meaning ..., the court may interpret the contract for itself," determining its meaning as a matter of law. *Id.*

So we must start by assessing whether the interpretation of the disputed language is reasonably susceptible to the interpretations urged by the parties. D & B's interpretation is that a Plan participant is to be paid, if there is a change in control, as if that person had attained 100% of his or her (singular) target. This is a reasonable construction. Section 6(a) of the Plan says that if there is a "reorganization," then performance "units ... shall immediately become payable in full, with the final value of such units determined as though performance criteria and targets for the full award period had been achieved." This is not fine prose nor, by itself, terribly clear. It would appear to have been drafted by lawyers. The use of "criteria" and "targets," in the plural, could be understood, in the singular, with D & B, to refer to a unique

---

1. The Sixth Circuit has questioned our reading of Illinois law in this respect. *See Blue Cross and Blue Shield Mutual of Ohio v. Blue Cross and Blue Shield Assoc.*, 110 F.3d 318, 326–328 (6th Cir.1997) ("[T]he Seventh Circuit's treatment of the issue has apparently not swept the Prairie State."). We still believe that we were correct, but this case does not present the proper factual basis for exploring the matter.

2. Application of canons of interpretation need not settle the issue, contrary to what appellants seem to argue. Even reading against the drafter may leave a provision ambiguous, especially if the interpretation offered by the opposing party is not one to which the language is fairly susceptible.

target (among several criteria) for each of several individuals covered by the Plan, that particular target to be specified in each case in that person's award letter. Or it could be understood, with appellants, to mean several different criteria and targets for each individual participant. Whatever the merits of appellants' interpretation, the provision is at least fairly susceptible to D & B's reading.

■ The reasonableness of D & B's interpretation is enhanced when we turn to the individual award letters. These letters were incorporated by reference into, and were therefore part of, the contract.[3] In the letters, "target" can plausibly be read as a singular term both as a matter of syntax and the logic of the awards which these letters grant to their recipients. The letters explain that "[t]he bonus criteria each take the form of a 'floor' parameter, below which no bonus will be earned, and *a* 'target' parameter, at which the guideline bonus will be paid" (emphasis added). This strongly suggests a single target per participant. Furthermore, each letter is accompanied by an Attachment B setting forth "parameters" which establish a single explicitly defined "target" level at which plan participants receive a 100% payout. They also established a "floor" level of performance at which participants receive no payout and a level called, in Note 3 of the Attachment, a "payout threshold"—not a target—at which participants receive a 200% or greater payout. Finally, Note 3 states that the "300% payout threshold is defined" as a certain distance "to *the* target" (emphasis added).

D & B's interpretation is therefore reasonable, since the language is fairly susceptible to the meaning that each participant has a unique target at which, in event of a change in control, that person will be paid as if she or he had attained the 100% level. Appellants' claim that the plain language of the contract requires judgment for them, therefore, fails. That does not settle the matter.

If appellants had an alternative interpretation which was also reasonable, the contract would be reasonably susceptible to different meanings. That would show that the contract is at least *prima facie* ambiguous. Such apparent ambiguity, under Illinois law, would trigger inquiry into parol evidence and rules of construction. Should these fail to resolve the ambiguity, discovery would then be in order. In the case before us, however, appellants have no plausible argument that their alternative interpretation is reasonable.

Appellants urge the following considerations in support of their claim that the contract entitled participants in event of a change in control to payout at whichever of multiple targets they had actually attained. First, they say that the plain meaning of § 6(a) is that they are to be made no worse off because of a change in control or that a change in control simply accelerates payment of the award to which a participant otherwise would have been entitled. That might be a possible interpretation of the provision taken in isolation. But it is not the plain meaning. As noted, the language will bear D & B's reading.

■ Moreover, Illinois law requires that we do not look at the contested language in isolation. We "examine [the contract] as a whole, giving effect, to the extent possible, to all contractual provisions. In so doing, the [contractual] language will be interpreted according to its plain, ordinary and popular meaning." *O'Rourke v. Access Health, Inc.*, 282 Ill.App.3d 394, 218 Ill.Dec. 51, 57, 668 N.E.2d 214, 220 (1996) (internal citations omitted). The whole contract includes the grant letters. Read together with the grant letters, the language of the contract as a whole can fairly be read as D & B urges, but cannot sustain appellants' construction.

Appellants say the letters do not explicitly state that payment at the target based on 100% of the guideline performance units is

---

**3.** The letters give participants the individual grant awards mentioned in the Plan at § 3 *et seq.* In Illinois, as elsewhere, a contract may comprise several writings. "As a general rule, a contract need not be contained in a single writing; it may be collected from several different writings which do not conflict with each other

and which, when connected, show the parties, subject matter, terms, and consideration." *O'Brien v. Kawazoye*, 27 Ill.App.3d 810, 327 N.E.2d 236, 240–41 (1975) (citing 17 C.J.S. Contracts § 58). Appellants, in any case, rely upon the language of the letters to support their own interpretation.

"payment in full." So to read it, therefore, would be to impermissibly add terms on which the parties did not agree. We remark that neither the Plan nor the letters explicitly say, in so many words, what appellants claim either. Interpretation is required in either case. But the final clause of § 6(a) can be reasonably interpreted to explicitly say just what D & B argues it does. If the units become "payable in full" with their final value "determined as though performance criteria and targets for the full award period had been achieved," and the "targets" are the 100% payout levels in the award letters, then they are payable in full at that level. This is interpretation of, not addition to, the contract.

Invoking the text of the letters, appellants say that the discussion in these of the possibility of "unbounded" payout at greater than the "target" 100% level shows that the language involves multiple targets. As noted above, however, the letters restrict the term "target" to the 100% payout level. The higher levels are "payout thresholds" which are expressly stated to be "above the target level." The contract has no provision for multiple targets. We cannot add such a term.

Appellants then suggest that even if there is only one "target," the reference to multiple "performance criteria" means that giving reasonable effect to all terms requires that their own performance units be valued at payout levels of greater than 100%, since they in fact exceeded their targets. Unfortunately this involves dropping the term "target" from § 6(a) and ignores the definition of "performance criteria" in the grant letters: "The performance criteria again take the form of floor and target parameters, with prorated payout for results *between* these amounts" (emphasis added). If we were to interpret the contract to require payment according to "performance criteria," this language suggests that participants might receive less than 100% payout if they failed to reach their target parameter—but not more than 100% in any case.

Second, appellants argue that the purpose of the contract is more consistent with their own than with D & B's interpretation. Reference to the purpose of a contract can be a useful aid in construction. "[I]f the principal purpose of the parties is ascertainable it is given great weight." Restatement (Second) of Contracts § 202(1). The express purpose of the Plan is to "motivate [key] employees to exert their best efforts...." Such a purpose is consistent with either of the proffered interpretations. We cannot say whether it would be more of an incentive to know that in event of a "change in control," one would be assured of a 100% payout level in any case or that in those circumstances one might get more or—possibly—less than that. D & B claims that the purpose of § 6(a) is to avoid difficulties and disputes in computing awards for a series of multiple targets in uncertain circumstances of a change in control. This may be true and would be reasonable, but nothing in the contract itself indicates anything of the sort. The purpose actually stated in the contract points clearly in neither direction.

Third, appellants point to Plan provision § 4(b), which says that D & B may not use a "change in control" as a basis for a change in the performance criteria, targets, or unit payment schedules. But this is not a reason for supposing that D & B did change any of these things when it offered the 100% payout as payment in full. That begs the question, which is whether D & B did breach the contract by changing the terms for the payout. Section 4(b) does not speak to what the terms of the payout are. It just says that whatever they are, they cannot be changed because of a change in control.

Appellants have failed to show that their interpretation is reasonable, much less required. Since D & B has shown that its interpretation is reasonable, there is no ambiguity to construe against the drafter or to clear up by appeal to extrinsic evidence. We apply the language of the contract as written. We construe it unambiguously to mean that appellants were entitled to be paid at the 100% payout level in the event of a change in control. Since they were in fact so paid, they have no cause of action. The district court therefore properly dismissed their claims with prejudice.

D & B urges, as its preferred basis for judgment, that the Executive Compensation

and Stock Option Committee which was designated to administer the Plan had discretionary authority to interpret and apply the Plan's provisions. D & B maintains that, under Seventh Circuit and United States Supreme Court precedent, such administrative action can only be reviewed if it is arbitrary and capricious, an abuse of discretion. *See Firestone Tire & Rubber v. Bruch*, 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80; *Swaback v. American Information Technologies Corp.*, 103 F.3d 535 (7th Cir.1996); *Krawczyk v. Harnischfeger Corp.*, 41 F.3d 276 (7th Cir.1994). As appellants correctly observe, these are ERISA cases. Their applicability to a straightforward Illinois law contract case is at best uncertain. *See AM Internat'l*, 44 F.3d at 576 (Applicable law in a diversity contracts case is state contract law.); *LaSalle National Bank v. Service Merchandise, Co.*, 827 F.2d 74, 78 (7th Cir.1987) (same). Since the case can be decided on the basis of the Illinois "four corners" rule for contract law, we need not reach the question of whether and to what extent analogous principles might apply out of an ERISA context or on the basis of the contract itself.

The judgment of the district court is therefore AFFIRMED.