**Gerald GARCIA, Plaintiff,**

v.

**FARMERS INSURANCE EXCHANGE, Defendant.**

**No. 99 C 5017.**

United States District Court, N.D. Illinois, Eastern Division.

Nov. 6, 2000.

---

Glenn E. Heilizer, Law Office of Glenn E. Heilizer, Chicago, IL, for Plaintiff.

William J. Sneckenberg, William J. Sneckenberg & Assoc., Chicago, IL, for Defendant.

## MEMORANDUM OPINION AND ORDER

BUCKLO, District Judge.

Gerald Garcia bought a house in Chicago, Illinois, intending to remodel it as an investment. On July 23, 1997, several trespassers broke in and lit a candle. They fell asleep, and woke to find the place ablaze. Two of them died in this tragedy, and the house was burned to the ground. The Chicago Police Department determined that the fire was accidental. Mr. Garcia had purchased a home insurance policy from Farmers Insurance Exchange (the "Exchange"), but the Exchange refused to pay.[1] Mr. Garcia sued, and now moves for summary judgment. I grant the motion.

### I.

This case is governed by Illinois contract law. Illinois uses a "four corners" rule in the interpretation of contracts. *Bourke v. Dun & Bradstreet Corp.,* 159 F.3d 1032, 1036 (7th Cir.1998). " 'The terms of an agreement, if not ambiguous, should be generally enforced as they appear, and those terms will control the

---

1. I have dealt with the identity and citizenship of the defendants for jurisdictional purposes in my minute order of March 4, 2000, and a previous memorandum opinion, *see* *Garcia v. Farmers Insurance Exchange,* 121 F.Supp.2d 667 (N.D.Ill.2000) (unpublished opinion) (determining that I have diversity jurisdiction).

rights of the parties. Moreover, any ambiguity in the terms of a contract must be resolved against the drafter of the disputed provision.'" *Id.* (*citing Dowd & Dowd, Ltd. v. Gleason*, 181 Ill.2d 460, 230 Ill.Dec. 229, 693 N.E.2d 358, 368 (1998)). *See also Illinois Farmers Ins. Co. v. Cisco*, 178 Ill.2d 386, 227 Ill.Dec. 325, 687 N.E.2d 807, 810 (1997) ("The terms of an insurance policy are to be applied as written. . . .").

The policy offers insurance covering "accidental direct loss" to the "dwelling." The only potentially relevant exclusions in the insurance policy are (1) "neglect of an insured to use all reasonable means to protect the property" or (2) "vandalism . . . if the dwelling has been vacant for more than 30 days before the loss." If the undisputed facts show that Mr. Garcia did not neglect to use all reasonable means to protect the property, and that the damage was not due to vandalism, he wins, other things being equal. I will come to these arguments, but first I deal with the other defense raised by the Exchange.

## II.

■ The Exchange argues there is a question of fact about whether Mr. Garcia fraudulently represented that the house would be occupied, which, if believed, would void the policy if the lie varied the insurer's risk. See 215 ILCS 5/154 (A written fraudulent misrepresentation in an application for coverage defeats an insurance policy if it materially affects the insurer's risk.). The Exchange presents evidence that when Mr. Garcia applied for the policy in November 1996, he lied to its agent, Carol Baldocchi, telling her that the premises would be occupied within one week, and would remain occupied throughout the rehab process. She testified that Mr. Garcia persisted in this lie even when he was orally informed that the policy would not cover a vacant building. In the application for coverage, the Exchange says, she wrote down that the building would not be vacant. I must accept that Mr. Garcia made this representation for purposes of this motion.

However, even if he did, that did not affect the Exchange's risk. The most fundamental problem with the argument is that the policy expressly says that "the residence premises may be vacant or unoccupied without limit of time, except where this policy states otherwise." Even if the house was vacant, therefore, the policy language clearly and unambiguously states that a vacant or unoccupied house was within the scope of the risk the insurer took. The Exchange responds that it would not have issued the policy had it known that the house was to be vacant, in which case it would have incurred no risk at all, an argument recalling Ambrose Bierce's definition of a "plenipotentiary" as an official who is granted "absolute power on the condition that he never use it." Ambrose Bierce, *The Devil's Dictionary* in *The Collected Works of Ambrose Bierce* (Dover Press 1944).[2] The only way that the vacancy clause could fail to affect the insurer's risk, given its plain meaning, was if it was never invoked, like the plentipotentary's powers. But the Exchange may not say in its policy that it covers "vacant or unoccupied" premises "without limit of time" and then argue that the invocation of this clause increases its risk because it never insures homeowners whose premises are vacant! The language of the policy estops the Exchange from saying that it did not intend to cover vacant houses. Moreover, whatever passed between Mr. Garcia and Ms. Baldocchi, it was not fraudulent for Mr. Garcia to avail himself of the coverage expressly offered in the policy, and its policy does cover for "vacant or unoccupied" premises "without limit of time."

■ The Exchange then argues that what it *really meant* by the vacancy clause was that it would insure a property that was occupied when the policy was issued but later became vacant during the policy

2. Bierce also defines "lawyer" as "one skilled in circumvention of the law." Id. at 289.

period. It offers evidence that refusing to insure premises that were vacant at the start of the policy period was its usual practice. It also argues that Mr. Garcia agreed to this condition in his conversations with their agent. However, as I have explained, Illinois contracts, including insurance policies, are enforced according to their plain language, without regard to matter or agreements outside the four corners of the agreement. The evidence of the usual practice of the Exchange and of any oral understandings reached between Mr. Garcia and its agent prior to the issuance of the policy is parol evidence, which Illinois courts exclude from the construction of unambiguous and integrated agreements. *See J & B Steel Contractors, Inc. v. C. Iber & Sons, Inc.*, 162 Ill.2d 265, 205 Ill.Dec. 98, 642 N.E.2d 1215, 1219 (1994). The vacancy clause is unambiguous, and the contract is expressly integrated. If the Exchange had meant to issue policies only to homeowners whose properties were then occupied or not vacant, it could have said so in the contract. *See Dawn Equip. Co. v. Micro–Trak Systems, Inc.*, 186 F.3d 981, 988 (7th Cir.1999) (Losing party had "had ample opportunity . . . in the written agreement[ ] to explain in plain English what it . . . meant. . . . If [it] failed to do so, the fault [wa]s entirely [its] own.").

### III.

 The Exchange argues that there is a question of material fact about whether Mr. Garcia used all reasonable means to protect the property. In construing an insurance policy, I apply "well established rules of construction," notably that "[t]he insurance contract must be liberally construed in favor of the insured and strictly construed against the insurer in order to realize the protection which the insured attempted to secure when he applied for the policy." *State Farm Fire & Casualty Co. v. Kohen*, 98 Ill.App.3d 860, 54 Ill.Dec. 242, 424 N.E.2d 992, 994 (1981). It is undisputed that Mr. Garcia kept the place locked up, and that he visited or drove by the premises every other week, but the Exchange says that he did so "seldom" after May 1997, and only saw or visited the premises on "approximately 18–20 occasions" from January to July 1997. What more should he have done?

The Exchange argues that he failed to have any additional security, fencing, or barriers installed. However, it cites no authority to show that a reasonable person would require more than biweekly visits and locks to protect a house, vacant or not,[3] nor has it brought forward evidence that a reasonable person would have taken stronger measures than Mr. Garcia took, for example, because the neighborhood was especially bad. It asks me to hold that come what may, biweekly visits and locks are not reasonable means to protect one's unoccupied property over an extended period. Without some support from Illinois case law or reference to special circumstances, I cannot so conclude. Mr. Garcia's measures to protect his property were not unreasonably inadequate as a matter of law, nor could a rational jury find that they were unreasonably inadequate without more than the bare observation that there were more things that he might have done. *See Garcia v. City of Chicago*, 240 Ill.App.3d 199, 181 Ill.Dec. 166, 608 N.E.2d 239, 242 (1992) ( "[M]eans need not be "the best possible ones"; they need only be "measures that a rational person could believe might help in some way to achieve the objective") (Illinois Governmental Immunity Act and state constitutional law context).

 Finally, the Exchange argues that there is an issue of material fact about whether the loss was caused directly or indirectly by vandalism when the premises were vacant for more than 30 days, one of the policy's exclusions. Here, though, the facts are in, and the question is rather one of law for me to decide, which is whether

---

**3.** I cannot find any case law where the Illinois courts have construed the language in ques-

tion in an insurance policy, but it really is not my job to do the defendant's legal research.

the loss is directly or indirectly due to vandalism when a house burns down because trespassers accidentally set fire to the place with a lighted candle. The term "vandalism" is not defined in the policy and does not appear to have been construed by Illinois courts. I follow Illinois practice of giving words in a contract their "usual and primary meaning at the time of the execution of the contract." *Missouri Pacific RR. Co. v. American Re–Ins. Co.*, 286 Ill.App.3d 129, 222 Ill.Dec. 1, 676 N.E.2d 965, 970 (1996). Webster's defines "vandalism" as "willful or malicious destruction or defacement" of property. *Webster's Third New International Dictionary of the English Language Unabridged* 2532 (1981). The connotation of the term is destruction primarily for its own sake. It does not extend to accidental damage, and the Chicago Police ruled the fire to be accidental. The Exchange argues that the fire was "indirectly" the result of vandalism, because the trespassers damaged the house breaking in, and so vandalized it. However, the damage caused when a trespasser jimmies a lock or breaks a window in order to get in, and not just or mainly to trash the place, is merely incidental to the purpose of gaining entry. It is not destruction for destruction's sake—that is, it is not vandalism in the ordinary sense. The vandalism clause does not apply.

### IV.

Mr. Garcia's motion for summary judgment is GRANTED.