In the

# United States Court of Appeals

### For the Seventh Circuit

No. 05-4352

ROLLIN DICK, as Trustee of the Amended
Hilbert Residence Maintenance Trust and
as Trustee of the Stephen C. and Tomisue
Hilbert Irrevocable Trust,

*Claimant/Appellant,*

*v.*

CONSECO, INC.,

*Debtor/Appellee.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 05 C 3170—**Robert W. Gettleman**, *Judge.*

ARGUED APRIL 13, 2006—DECIDED AUGUST 11, 2006

Before COFFEY, KANNE, and WILLIAMS, *Circuit Judges.*

KANNE, *Circuit Judge.* Conseco, Inc. and two of its senior
officers entered into certain employee benefit agreements.
Shortly thereafter, both officers' employment with Conseco
ended, and Conseco subsequently went bankrupt. At issue
is whether Conseco's obligations under certain of these
agreements continued for the benefit of one of these former
employees after Conseco's bankruptcy. The bankruptcy
court did not think so and granted summary judgment in
favor of Conseco. The district court agreed, and for the
following reasons, we affirm.

## I. HISTORY

Stephen Hilbert and Rollin Dick were the CEO and CFO, respectively, of Conseco. In the years prior to Conseco's 2002 bankruptcy filing, they received hundreds of millions of dollars from Conseco in the form of salary, loan guarantees, and various other ostensible forms of compensation. In late 1998, Hilbert and Dick entered into so-called Split-Dollar Agreements (the "Agreements") with Conseco. The subject matter of each Agreement was one life insurance policy, in which either Hilbert or Dick (or their spouses) was the insured. Under the Agreements, Conseco would be responsible for remitting the premium payments to the insurance companies, with a small contribution to be made by Hilbert and Dick. There were five Agreements in all, with four benefitting Hilbert and the fifth benefitting Dick. At issue here are the four Agreements in which Hilbert was the insured and Dick was named as trustee.

On December 8, 1998, Hilbert asked Conseco's compensation committee for formal authorization of the Agreements. At that meeting, Hilbert noted that due to Conseco's previous encouragement of senior executives to purchase large amounts of company stock, the death of a senior executive could inflict a liquidity crisis upon the estate and require the expedited sale of Conseco stock without regard to existing market conditions. The life insurance, Hilbert explained, would alleviate this potential cash crunch. The committee authorized Conseco to enter into the Agreements.

There were three parties to each Agreement: Conseco, the "Employee" (Hilbert), and the "Owner" of the insurance policy. The four policies were owned by two irrevocable trusts created by Hilbert in which Dick was the trustee (the "Trusts"). Neither Hilbert nor Dick were beneficiaries of the Trusts. The policy amounts for three of the policies was $25 million each, and $12.5 million for the fourth, for a total death benefit of $87.5 million.

Under the Agreements, Conseco agreed to pay virtually all of the annual premiums for each insurance policy. Conseco's stated motivation was to reflect that "the Employee is also an officer and director of the corporation and has contributed significantly to its success. The Corporation desires to continue to retain the services of the Employee."

The Agreements required Conseco to determine the precise allocation of premium payments between Conseco and Hilbert, calculated to ensure favorable tax treatment to Hilbert. Hilbert or one of the Trusts was to forward Hilbert's portion to Conseco, which, in turn, was to remit the full premium payments to the insurers.

Hilbert was the sole insured person under the $12.5 million policy. The other polices were "second-to-die" polices, in which the death benefit did not pay until after the deaths of both Hilbert and his wife. When the death benefit payments were to be paid, Conseco had the "unqualified right" to recover the amount of premium payments it had made. The policies' owners (the Trusts) were entitled to the remaining balance, if any. In addition, Conseco obtained a collateral assignment for each insurance policy to secure this reimbursement.

The Agreements specified two events which would terminate the Agreements before the death benefits came due: bankruptcy of Conseco, or Hilbert's share of the annual premium was not paid and Conseco elected not to cover the shortfall. In either case, the Trusts had the option to purchase the policies from Conseco within 60 days of the termination event by reimbursing Conseco for its premium payments. Such a purchase had the added effect of releasing Conseco's collateral assignment. If the 60-day period lapsed, Conseco had the option of becoming the owner of the policies or enforcing its security interest by surrendering the policies for cash. If Conseco elected to surrender the policies, it could take reimbursement from the proceeds with any residual to be remitted to the Trusts.

The parties operated under the Agreements from 1998 until December 2001. Hilbert and Dick's employment with Conseco ended in April 2000, the circumstances of which are not before us. Conseco stopped paying the premiums on Hilbert's policies beginning with the December 2001 payment. The policies did not lapse as a result of the nonpayment; at some point the Trusts converted them to paid-in-full policies with lower death benefits.

On December 17, 2002, Conseco filed its petition for bankruptcy. On February 19, 2003, the Trusts filed proofs of claim against Conseco alleging that Conseco breached the Agreements. On September 9, 2003, the bankruptcy court entered an order confirming Conseco's plan of reorganization, and the plan became effective the following day. In September 2004, Conseco informed the Trusts of its intent to exercise its early termination rights, to which the Trusts responded that they would sue Conseco for breach of contract and conversion should Conseco attempt to do so. On April 13, 2005, the bankruptcy court granted summary judgment in favor of Conseco. The district court affirmed, and the Trusts appeal.

## II. ANALYSIS

"In a second appeal from a bankruptcy court's decision, we apply the same standard of review as did the district court," which in the case of the bankruptcy court's grant of summary judgment, is de novo. *Frierdich v. Mottaz*, 294 F.3d 864, 867 (7th Cir. 2002) (citing *In re Marrs-Winn Co.*, 103 F.3d 584, 589 (7th Cir. 1996)). The standards of Rule 56 of the Federal Rules of Civil Procedure apply to summary judgment in bankruptcy proceedings. Fed. R. Bankr. P. 7056; *In re Colonial Discount Corp.*, 807 F.2d 594, 596 (7th Cir. 1986). Summary judgment should not be granted unless there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.

Fed. R. Civ. P. 56(c). We review the bankruptcy court's factual findings for clear error and its legal conclusions de novo. *Dye v. United States*, 360 F.3d 744, 747 (7th Cir. 2004) (citations omitted).

Conseco argues that the filing of its bankruptcy petition triggered the early termination provision of the contract. Early termination provisions are commonly invalidated by 11 U.S.C. § 365(e)(1) of the Bankruptcy Code, which provides:

> [N]otwithstanding a provision in an executory contract or unexpired lease, or in applicable law, an executory contract or unexpired lease of the debtor may not be terminated or modified, and any right or obligation under such contract or lease may not be terminated or modified, at any time after the commencement of the case solely because of a provision in such contract or lease that is conditioned on—
>
> . . .
>
> (B) . . . the commencement of a case under this title.

Section 365 applies only to executory contracts; therefore, if the Agreements were not executory contracts on December 17, 2002, then the filing of Conseco's bankruptcy petition on that date will have ended its obligations by virtue of the early termination clause. Although the Bankruptcy Code does not define "executory contract," we have held an executory contract for § 365 purposes "is a contract on which performance remains due to some extent on both sides." *In re Streets & Beard Farm P'ship*, 882 F.2d 233, 235 (7th Cir. 1989) (citing S. Rep. No. 95-989 at 58 (1978) and H.R. Rep. No. 95-595 at 347 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5844 and 5963, 6303, respectively); *see NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 523 n.6 (1984) (citing same to define "executory contract" for 11 U.S.C. § 365(a)). Recognizing that the literal definition would render nearly all agreements executory, we determined that

in order to effectuate Congress's intent, § 365 should be applied only "to contracts where *significant* unperformed obligations remain on both sides." *Streets & Beard Farm P'ship*, 882 F.2d at 235 (emphasis added) (citing Vern Countryman, *Executory Contracts in Bankruptcy: Part I*, 57 Minn. L. Rev. 439, 460 (1974)); *cf. Gouveia v. Tazbir*, 37 F.3d 295, 298-99 (7th Cir. 1994) (citation omitted) (holding restrictive covenant giving ongoing right of present enjoyment of real property did not amount to an executory contract subject to § 365). In other words, a contract is executory if each party is burdened with obligations which if not performed would amount to a material breach. *See Streets & Beard Farm P'ship*, 882 F.2d at 235; *In re Columbia Gas Sys. Inc.*, 50 F.3d 233, 239 (3d Cir. 1995) ("[U]nless both parties have unperformed obligations that would constitute a material breach if not performed, the contract is not executory under § 365.").

Because there is no dispute that the Agreements are governed by Indiana law, whether the remaining obligations are significant, *i.e.,* whether all parties could have materially breached the Agreements when Conseco filed its petition, is a question of Indiana contract law, which we review de novo. *See Bourke v. Dunn & Bradstreet Corp.*, 159 F.3d 1032, 1036 (7th Cir. 1998) (citations omitted); *Streets & Beard Farm P'Ship*, 882 F.2d at 235 (concluding debtor to be equitable property owner under Illinois law).

To determine whether the failure to perform a contractual duty amounts to a material breach, Indiana has adopted the view of the Restatement (Second) of Contracts, which considers several factors:

> (a) the extent to which the injured party will be deprived of the benefit which he reasonably expected;
>
> (b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived;

(c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture;

(d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances;

(e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.[1]

*Frazier v. Mellowitz*, 804 N.E.2d 796, 803-04 (Ind. Ct. App. 2004) (quoting Restatement (Second) of Contracts § 241 (1981)).

We need only to consider Hilbert's contractual duties to conclude that the Agreements were not executory contracts when Conseco filed its petition for bankruptcy. Hilbert's primary obligation under the Agreements was to continue working for Conseco.[2] In each of the Agreements, Hilbert was referred to as the "Employee" who "is also an officer and director of the Corporation and has contributed significantly to its success." Conseco recited that it "desires to continue to retain the services of the Employee, and accordingly, the Corporation is willing to pay a portion of the premiums due on the Policy as an additional employment benefit." However, by the time Conseco filed for bankruptcy, Hilbert was no longer in Conseco's employ. Hilbert's only remaining obligation under the Agreements was to remit timely his share of the life insurance premi-

---

[1] Because we are analyzing *the effect* of a hypothetical failure to perform, good faith is irrelevant.

[2] If Hilbert's employment obligations were not considered to be part of the bargain, then it is likely that the formation of the Agreements would have failed for lack of consideration, which would be no help to the Trusts here.

ums to Conseco, and it is the significance of this duty we evaluate.

If Hilbert stopped paying his life insurance premiums (and the Trusts likewise failed to make payments in Hilbert's stead), there would have been no discernible detriment to Conseco. The Agreements did not impose a duty upon Conseco to continue to make payments in full while covering Hilbert's shortfalls. In fact, Hilbert's nonpayment was the other termination event under the Agreements, and in that event, Conseco would have had the option to discontinue its own performance. Moreover, Conseco's security interest was effective regardless of whether the policies were prematurely surrendered for cash or ultimately a death benefit was paid.

Therefore, if Hilbert had ceased performance of the Agreements, Conseco's contractual remedies gave it the choice of seeking immediate reimbursement or remitting the full premium amounts and be repaid upon Hilbert's death. Although both options—particularly early termination—posed a likelihood that the payout would have been insufficient to make Conseco whole for premiums it did pay, the Agreements did not entitle Conseco to any other source of recovery.[3] Because Conseco would have suffered no actionable damages should Hilbert fail to perform, it would not have been entitled to sue him for material breach.

Therefore, Hilbert could not have materially breached the Agreements by discontinuing his performance.[4] It follows

---

[3] We note Hilbert's 60-day option in the event of early termination required him first to repay Conseco in the entirety. Although it is possible Conseco could be satisfied by Hilbert in this manner, it does not provide a basis for a lawsuit by Conseco.

[4] We need not consider what impact Hilbert's nonperformance
(continued...)

that the Agreements were not executory contracts when Conseco filed for bankruptcy. Because there would be not even a scintilla of injury to another contracting party, the issue whether Hilbert had any interests subject to forfeiture is irrelevant. We conclude that § 365 does not impede the operation of the Agreements' termination clauses, which were invoked by Conseco's petition for bankruptcy. The Trusts present several alternative arguments.

First, the Trusts claim that Conseco waived its rights upon termination by failing to exercise them in a reasonable time. The Trusts claim Conseco's notice in September 2004 of its intent to exercise its termination rights amounted to a two-year period of silence, giving rise to a factual issue of reasonableness.

Because the Agreements did not impose a deadline upon Conseco to exercise its termination rights, Indiana law requires Conseco to have acted within a reasonable time, which is determined by considering "the subject matter of the contract, the circumstances attending performance of the contract, and the situation of the parties to the contract." *Harrison v. Thomas*, 761 N.E.2d 816, 819 (Ind. 2002) (citing *Epperly v. Johnson*, 734 N.E.2d 1066, 1072 (Ind. Ct. App. 2000)).

The contracts terminated on December 17, 2002, the date Conseco filed for bankruptcy. Under the Agreements, Hilbert or the Trusts first had 60 days to exercise their option to buy out Conseco's security interest before Conseco's termination rights accrued on February 17, 2003. However, neither Hilbert nor the Trusts pursued this remedy. Rather, the Trusts initiated this litigation against Conseco on February 19, 2003, a mere two days after

---

[4] (...continued)
would have had on the Trusts because a precondition of injury to the Trusts would be their own failure to cover for Hilbert.

Conseco's termination rights had ripened. The Trusts have continuously asserted that the Agreements did not terminate, *i.e.*, that Conseco had no termination rights at all.

Conseco's inactivity during the litigation was reasonable. The existence of Conseco's termination rights was the focus of this litigation and exercising them likely would have resulted in more claims filed by the Trusts. In addition, the Trusts do not point to any harm they have suffered in the interim. Rather than two years, the only time which conceivably could count against Conseco is the two-day period preceding this litigation, and we must take into account that the Agreements did not state or imply that time was of the essence. With no basis to conclude otherwise, Conseco did not waive its termination rights.

Second, the Trusts maintain that Conseco could not exercise its early termination rights because it had breached the Agreements by discontinuing the insurance payments a year before filing for bankruptcy. The Trusts argue this alleged breach reduced the paid balances of the insurance policies from what they would have been had Conseco continued making payments. But the Agreements contain no terms which would negate Conseco's security interests in the policies in the event of a material breach by Conseco. Indeed, the security agreements explicitly state that Conseco's rights in the collateral could only be extinguished if the Trusts fully repaid all their liabilities to Conseco.

There is no indication in the record, nor do the Trusts assert, that the cash surrender value of the policies was sufficient to reimburse Conseco for the payments it had made. So whatever impact Conseco's nonpayment had upon the policies, Conseco's reimbursement rights were not disturbed, nor could they have been satisfied. Therefore, even if Conseco breached the Agreements by discontinuing the payments, the Trusts have not shown they would be entitled to any damages as a result.

Finally, the Trusts argue that there remain factual disputes regarding many topics (most of which we have discussed), including whether the Agreements were executory; whether Conseco waived its right to be reimbursed; whether Conseco was first to materially breach the agreements; whether Conseco waived its early termination rights; and whether the Trusts should continue to hold the policies.

Without more, merely fashioning as factual issues what are actually questions of law cannot forestall summary judgment. At most, these questions involve so-called ultimate facts, such as reasonableness. However, there is no dispute as to the underlying occurrences, and resolving the predicate legal issues leaves no room for reasonable disagreement.

### III. CONCLUSION

For the foregoing reasons, the decision of the district court is AFFIRMED.

A true Copy:

       Teste:

          _____
          *Clerk of the United States Court of*
          *Appeals for the Seventh Circuit*