In the
United States Court of Appeals
For the Seventh Circuit

Nos. 99-2734 & 99-2892

Susan Cooper Houben,

Plaintiff-Appellee/Cross-Appellant,

v.

Telular Corporation,

Defendant-Appellant/Cross-Appellee.

Appeals from the United States District Court
for the Northern District of Illinois, Eastern
Division.
No. 97 C 1489--Ruben Castillo, Judge.

Argued May 18, 2000--Decided November 3, 2000

   Before Posner, Diane P. Wood, and Williams,
Circuit Judges.

   Diane P. Wood, Circuit Judge.  This case
is principally about the commissions
Susan Cooper Houben claimed she earned
working as the director of corporate
development for Telular Corporation, a
manufacturer of coupling devices for
telephones and cellular radios. Houben's
employment with Telular came to a rather
abrupt end around the same time that she
sought to take a second maternity leave,
and she later sued for damages under a
number of theories. Five claims went to
trial, and a jury awarded Houben $98,364
in damages on two of them. Both sides
have appealed, Telular from the denial of
its motions for summary judgment,
judgment as a matter of law, and a new
trial, and Houben from the grant of
summary judgment in Telular's favor on
two of her fraud claims. We find no
reversible error in any of the district
court's rulings and therefore affirm
across the board.

I

   Houben became director of corporate
development for Telular in 1994. The next

year Telular asked her to head the "Motorola Account Team" and focus her energies on selling Telular products to Motorola. As director of corporate development, she was a salaried employee; in her new sales position, however, her compensation changed to a mix of salary and commissions. In August 1995, Houben received a memorandum explaining her new compensation package. In addition to her base annual salary of $75,000, she was eligible to receive monthly sales commissions, an annual bonus, and stock options. The memo described monthly sales commissions as follows:

#2 Monthly Sales Commission

Your monthly sales commission will equal one percent of all Motorola generated revenues attributed to the Motorola team. Unless specified differently in writing the Telular team will be credited with 80% of Motorola revenues with the remaining 20% being credit [sic] to the geographic field organization where the equipment was installed.

The maximum amount you can earn from monthly commissions in any one fiscal year is $90,000. Should such a cap be invoked and should you continue to excel in generating revenue above and beyond the point where the cap takes effect, management will recognize such performance when considering the amounts to be granted under items #3 [annual bonus] and #4 [stock options].

An April 19, 1995 memorandum titled "Managing House Account" describes the general operation of Telular's commission plan, including Telular's policy on revenue sharing: "Telular is prepared to pay up to 3% of sales revenue whether that revenue be generated by the geographic field sales force or the Corporate Development staff. . . ." The memorandum went on to explain how the 3% of sales revenues would be allocated among various Telular teams. Neither the general April 1995 memorandum nor thespecific August 1995 memorandum to Houben define the term "revenues."

During Houben's tenure, Motorola was competing for a large order from the telecommunications agency in Hungary. Houben and her team worked to have Telular selected as Motorola's supplier

for the deal. For three months of the time leading up to Telular's selection as the supplier (from May 27 to August 21, 1995, to be exact) Houben was out on maternity leave; even then, however, she remained in touch with her team, speaking with them over the telephone and at her home.

The efforts of Houben and her team paid off, as the Hungarian supply contract eventually went to Telular. In the fall of 1995, Telular announced the news that Motorola had agreed to purchase $100 million in Telular products to service the Hungarian deal. (The full $100 million in sales never materialized, but Telular eventually shipped $8.586 million of product to Motorola in 1996 and $21.190 million in 1997.) On January 4, 1996, Houben informed Telular that she was pregnant and would be taking a second maternity leave in August of that year. Later that month Houben was told she was being fired; her employment was terminated on February 2.

Houben never received commission payments related to the sales attributable to the Motorola deal in Hungary. Even though the initial purchase order did not issue until March 1996-- after Houben had been terminated and left Telular--she nonetheless believed that she was entitled to commission payments on the sales that were actually made, because she and her team were responsible for securing the underlying deal.

Houben filed suit in March 1997. In addition to alleging federal claims under Title VII, the Pregnancy Discrimination Act, and the Family and Medical Leave Act, she alleged various state law claims related to the breach of her employment contract (e.g., breach of written employment agreement, fraud, accounting, etc.). In the end, only the three federal claims and the state claims for breach of employment contract and commissions under the Illinois Wage Payment and Collection Act (IWPCA), 820 ILCS 115/14, went to trial. The jury returned a verdict in favor of Telular on the federal claims and in favor of Houben on the state law claims, awarding her damages totaling $98,364.

II

Before turning to the merits of the two appeals, we must discuss an issue concerning our appellate jurisdiction. One of the theories under which Houben proceeded, and for which the jury awarded her damages, arose under the IWPCA. Under that statute, an employer who is ordered, either by the Illinois Department of Labor or a court, to pay wages due an employee and fails to do so within an allotted time, is liable for statutory penalties of 1% per calendar day of delay. 820 ILCS 115/14(b). After the district court denied Telular's post-trial motions, including a motion to set aside the IWPCA award, Houben argued that Telular owed her statutory penalties because it had failed to pay its damages immediately. The district court did not resolve the question of Telular's liability for penalties; instead, it imposed a supersedeas bond of $200,000 on Telular. Telular responded with a motion to stay judgment and for a revised supersedeas bond, requesting a ruling that the IWPCA penalty provision did not apply to this case. Again the district court declined to rule on this issue, but it stayed any penalties from accruing.

Normally the failure to rule on an issue would deprive this court of jurisdiction, as we have jurisdiction only over final judgments of the district courts, 28 U.S.C. sec. 1291, which means that all issues in the litigation must be resolved. Alternatively, the district court may enter a Rule 54(b) judgment if there has been a final resolution of one or more (but not all) claims, allowing the parties to appeal from those parts of the judgment while allowing the district court and the parties to continue working on the remaining issues in district court. See, e.g., Union Oil Co. v. John Brown E&C, 121 F.3d 305, 310-12 (7th Cir. 1997); King v. Gibbs, 876 F.2d 1275, 1277 (7th Cir. 1989).

Even without a Rule 54(b) order, however, there are narrow circumstances in which the existence of unresolved issues in the district court does not defeat the finality of the judgment. The most well known of these is the collateral issue of attorneys' fees, where the failure to issue a final order on fees does not mean that appellate jurisdiction is lacking over the merits appeal. Budinich v. Becton Dickinson &

Co., 486 U.S. 196, 200-01 (1988) (a post-judgment award of attorneys' fees is separate from the judgment on the merits for purposes of 28 U.S.C. sec. 1291 and appeals can be taken separately from each). Whether penalties under the IWPCA should be treated the same way as fees is the question now before us./1

There are important functional similarities between the IWPCA penalties and attorneys' fees. Like fees, IWPCA penalties "cannot be quantified until the entry of final judgment. So, if the pendency of such a claim prevented the judgment from becoming final, it could never become final." Alonzi v. Budget Constr. Co., 55 F.3d 331, 333 (7th Cir. 1995). See Budinich, supra; Patzer v. Board of Regents of the University of Wisconsin System, 763 F.2d 851, 859 (7th Cir. 1985) (same). An outstanding request for costs similarly does not defeat finality. See Wielgos v. Commonwealth Edison Co., 892 F.2d 509, 511 (7th Cir. 1989). Furthermore, unlike a subject like prejudgment interest, which must be resolved before the judgment and incorporated into the judgment, see Osterneck v. Ernst & Whinney, 489 U.S. 169, 175-76 (1989), penalties under the IWPCA do not belong in the judgment. They relate instead to the collection proceed ings; indeed, a right to IWPCA penalties may never even arise--a right to such a payment depends entirely on post-judgment facts. We conclude that the unresolved nature of the IWPCA question does not defeat our appellate jurisdiction, see generally 15B Wright, Miller & Cooper, Federal Practice and Procedure 2d sec. 3915.6, at 347-49 (1992), and we therefore proceed to the merits of the appeal and cross-appeal.

III
A.   Telular Appeal

The jury found that Telular breached its contract with Houben and that it had violated the IWPCA for failing to pay her the commissions to which she was entitled. The jury was instructed that it could find for Houben on the breach of contract claim if the contract provided that commissions were earned as soon as a conditional sales agreement was entered into or if it concluded that the contract entitled Houben to commissions if she was the "procuring cause" of the sales to

Motorola. Telular challenges both theories on appeal.

Telular contends that the district court erred in not finding as a matter of law--in either its motions for summary judgment or judgment as a matter of law--that under the language of the Telular commission plan, Houben was not entitled to a commission for her work on the Hungary Motorola project. Telular first argues that the court should have found that the commission plan was unambiguous, and that it clearly barred Houben's claim. It thinks this turns on the meaning of the term "revenue," which it then argues can only be interpreted as "income received after product was shipped." Alternatively, it argues that even if the term "revenue" in the commission plan is ambiguous, the extrinsic evidence so overwhelmingly supported Telular's interpretation that the court should have found it to be the only one supported by the facts. Finally, it urges that even under Houben's interpretation of the commission plan, no event giving rise to a right to commissions occurred during Houben's tenure at Telular, because no orders were received during that time period, and that this fact alone should have precluded her claim.

We begin with the well-accepted principle that when contract construction is at issue, the question whether contractual terms are ambiguous or not is a question of law for the court to decide. See, e.g., Independent Construction Equipment Builders Union v. Hyster-Yale Materials Handling, Inc., 83 F.3d 930, 932 (7th Cir. 1996). (We note that the allocation of responsibilties between judge and jury is a question of federal law, see Mayer v. Gary Partners & Co., 29 F.3d 330, 333-35 (7th Cir. 1994), even though it is uncontested that the substance of this contract is governed by Illinois law.) If the contract is ambiguous, the proper construction of the contract's terms--that which accords with the intent of the parties--is a question of fact, and we may turn to extrinsic evidence to determine the intent of the parties. See Rossetto v. Pabst Brewing Co., 217 F.3d 539, 542 (7th Cir. 2000); see also C.A.M. Affiliates, Inc. v. First Am. Title Ins. Co., 715 N.E.2d 778, 782 (Ill. App. Ct. 1999).

Although as we noted, the parties have argued about the meaning of the term revenue in these instruments, we believe that debate misses the central point here. Telular is not really arguing about the meaning of the term "revenue" in itself; its point has to do with the questions of who is entitled to a commission and at what time is that right earned. The written instruments offer no guidance on either point.

The silence of the contract requires us to turn to the extrinsic evidence, as we did in Rossetto, supra. The evidence of Telular's long-standing practice indicates that commissions were earned on revenues actually generated from products shipped. Houben has no quarrel with this interpretation. She does not claim, for example, that she is owed commissions on the announced potential sales of $100 million on the Motorola Hungary project; instead, she claims only commissions based on the sales that actually went through. Granting that Telular indeed earned money from the Hungarian project, the only dispute is about what events entitled Houben to commission payments, when those events occurred, and whether such events had to occur during the time of her employment in order for her to receive a commission for those sales. Telular contends that all of the extrinsic evidence demonstrates that under the commission plan, commissions were not earned until the product was shipped. It then concludes that because no products for the Motorola Hungary project were shipped during the time that Houben was still employed with Telular, she earned no commissions for that project.

Even if we assume that the event triggering a right to a commission was the shipment of the product, there was sufficient evidence for the jury to conclude that the commission was attributed to the salesperson or team responsible for the sale at the time the deal was struck, not at the time of shipment. The evidence does not demonstrate that commissions were as a matter of practice no longer attributable to the employee who did the legwork on the sale simply because she left the company, was fired, or moved to a different job within the company between

the time the sale was closed and the shipment of the product. One Telular executive testified that "when the deal is struck, you make your decision then as to who the commissions--who is entitled to commissions; but you physically don't pay the money until cash is received." In addition, although Telular normally did not pay a commission on a sale until it had the money from the sale in hand, there were exceptions to this practice. Indicating that it regarded the right to the commission as having accrued, even if the money had not yet been paid out, Telular allowed salespersons to take out advances on expected commissions in order to ease their cash flow. The company treated the advance like a loan and deducted it from the salesperson's eventual commissions; if the salesperson was terminated before the commission came through, however, the advance would be forgiven. To similar effect (though also susceptible to interpretation in Telular's favor), when Telular was downsizing and asking people to leave, the company paid the person "half thecommissions he would have been entitled to" as a type of severance package.

In short, although the evidence in Houben's favor was not overwhelming, it was enough for a reasonable jury to conclude--as this one did--that Houben was entitled to a commission on those sales she helped to procure even though she was no longer employed by Telular at the time the products were shipped. We therefore find that the district court did not err in denying Telular's motions for summary judgment and judgment as a matter of law, nor did it abuse its discretion in denying Telular's motion for a new trial.

We would reach the same result under the procuring cause doctrine, which entitles a party "to commission on sales made after termination of a contract if that party procured the sales through its activities prior to termination." Hammond Group, Ltd. v. Spalding & Evenflo Cos., 69 F.3d 845, 850 (7th Cir. 1995), quoting Scheduling Corp. of Am. v. Massello, 503 N.E.2d 806, 809 (Ill. App. Ct. 1987). "The purpose of this rule is to protect a salesperson who is discharged prior to the culmination of a sale, but after he or she has done everything that is

necessary to effect the sale." Furth v. Inc. Publ'g Corp., 823 F.2d 1178, 1180 (7th Cir. 1987), citing Schroeder v. Meier-Templeton Assocs., Inc., 474 N.E.2d 744, 750 (Ill. App. Ct. 1984). Telular argues that Houben should not have been able to present the "procuring cause" theory to the jury, because the procuring cause doctrine is unavailable if the parties have specifically contracted about when commissions were to be paid. See Scheduling Corp., 503 N.E.2d at 809. As explained above, however, the parties to this contract did not specifically contract as to when commissions were to be paid, given the silence of the contract regarding the accrual of the right to a commission and the timing of commission payments.

On the merits, Telular contends there was insufficient evidence for the jury to find that Houben was the "procuring cause" of Telular's sales to Motorola on the Hungary project. Telular argues that no firm commitment from Motorola was received during Houben's tenure, and that Houben was only a minor participant in the actual sales effort, as her duties were largely administrative.

The jury was not compelled to see things as Telular now portrays them. Although Motorola placed no actual purchase order during Houben's tenure, Telular did win the competition to be Motorola's supplier on the deal and it publicized that fact several months before Houben's departure. One Telular executive testified that Telular's "victory" in the Motorola Hungary deal constituted a "firm order": "You would never go public like this [with a press release] if you didn't believe [the order] was firm." Telular's argument that Houben was a minor participant in the sale runs up against the fact that the company created a special sales team to focus on the Hungary deal and placed Houben at its head. She may not have been the salesperson on the ground in Hungary, but she was responsible for overseeing the work of the sales team and figuring out how to position Telular to get the contract.

Ultimately, whether Houben was the procuring cause of the Motorola Hungary sales was a question of fact to be decided by the jury. Again, although the

evidence was not overwhelming, it was sufficient for a reasonable jury to find that Houben deserved credit--and a commission--for the sale under Illinois's procuring cause doctrine.

B.  Houben Cross-Appeal

On her cross-appeal, Houben argues that the district court erred in granting summary judgment for Telular on her fraud and constructive fraud claims. Briefly, the basis for those claims was as follows, taking the facts in the light most favorable to Houben. At the same time as Telular announced the first Motorola contract for the Hungary deal, it secretly decided not to continue employing an in-house sales force, but instead to outsource the sales function and to stop paying commissions to its sales people. It also decided to downsize its workforce more generally. In furtherance of this plan, it terminated its relationship with an outside consultant that had administered its computerized commission payment system. In November 1995, one of Houben's subordinates asked her what was afoot, because he had seen troublesome documents on another person's desk. When Houben inquired, however, her supervisor told her (up through mid-January 1996) that "nothing will change." Houben continued to perform her job on that assumption.

In order to establish fraud under Illinois law, a plaintiff must prove that (1) defendant made a false statement; (2) of material fact; (3) which defendant knew or believed to be false; (4) with the intent to induce plaintiff to act; (5) the plaintiff justifiably relied on the statement; and (6) the plaintiff suffered damage from such reliance. Williams v. Chicago Osteopathic Health Sys., 654 N.E.2d 613, 619 (Ill. App. Ct. 1995); Dresser Indus., Inc. v. Pyrrhus AG, 936 F.2d 921, 934 (7th Cir. 1991). "Promissory fraud" is a false representation of intent concerning future conduct, such as a promise to perform a contract when there is no actual intent to do so. Doherty v. Kahn, 682 N.E.2d 163, 176 (Ill. App. Ct. 1997). As a general rule, promissory fraud is not actionable in Illinois unless the promise is part of a "scheme" to defraud. Id.

In granting Telular's motion for summary judgment, the district court reasoned that Houben had failed to present any facts demonstrating that Telular intended to defraud her. In particular, Houben presented no evidence that when Telular promised her that she would receive sales commissions the company in fact had no intention of making those payments. Houben argues that Telular's decision to restructure its sales operation and stop paying commissions to its salespeople provides the missing evidence of Telular's intent to defraud her. She also points to company managers' reassuring statements that "nothing would change" as further proof of a fraudulent scheme designed to induce her to continue working despite the planned changes in sales force structure and compensation.

Like the district court, we find that Houben's evidence was not enough to create a jury issue on either the question of Telular's fraudulent intent or the "scheme to defraud" requirement of promissory fraud. Evidence regardingTelular's decision not to pay commissions relates to events beginning in October 1995--after the commission plan was released in April 1995 and after Houben's individual compensation memo was drafted in August 1995. The comment that "nothing would change" seems to be no more than the general sort of platitude that company managers are prone to utter when a workforce is being restructured. It cannot be stretched into evidence of a fraudulent scheme. And even if the comments could be seen as the kind of intentional and false statements of material fact Illinois requires, Houben's claim would also fail because she has offered no evidence of any reliance on those statements.

Houben's constructive fraud theory was also properly rejected. Constructive fraud "is a breach of a legal or equitable duty that the law declares fraudulent because of its tendency to deceive others, irrespective of the moral guilt of the wrongdoer." Beaton & Associates, Ltd. v. Joslyn Mfg. & Supply Co., 512 N.E.2d 1286, 1291 (Ill. App. Ct. 1987). An essential element of the claim is "a breach of duty, especially fiduciary duty." Kohler v. Leslie Hindman, Inc., 80 F.3d 1181, 1188 (7th Cir. 1996). Such a breach can be shown

where there is great inequality between the parties. See In re Estate of Neprozatis, 378 N.E.2d 1345, 1349-50 (Ill. App. Ct. 1978). But the mere breach of an employment contract is insufficient to give rise to a claim of constructive fraud. See Gross v. University of Chicago, 302 N.E.2d 444, 453-54 (Ill. App. Ct. 1973) (employer/employee relationship does not create fiduciary duty on the part of the employer). Houben argues that constructive fraud nonetheless applies because Telular was clearly dominant in the relationship: the company had "superior knowledge" and "overmastering influence." See Mitchell v. Norman James Constr. Co., 684 N.E.2d 872, 879 (Ill. App. Ct. 1997). At bottom, however, Houben's case is indistinguishable from any other case in which an employer allegedly breached an employment contract. She offers no legal authority that would justify treating this breach (assuming that is how it should be viewed for these purposes) differently from any other breach. We therefore find that the district court correctly granted summary judgment on this claim.

*   *   *   *

The judgment of the district court is AFFIRMED.

/1 For the sake of completeness, we note that the district court's decision not to rule on Telular-'s argument that the IWPCA does not apply to this case may leave open the question whether the IWPCA was pre-empted by federal laws governing the payment of judgments, such as 28 U.S.C. sec. 1961 and Fed. R. Civ. P. 62(d). In light of our ruling here that this entire subject is a collateral issue analogous to attorneys' fees, we leave consideration of that question to the district court in future proceedings. We express no opinion on the question whether Telular has properly preserved such an argument, or if it was waived, as that too is better addressed by the district court in the first instance and it has not been briefed in this court.