In re PRE–PRESS GRAPHICS COM-
PANY, INC. d/b/a R & B Group,
an Illinois Corp., Debtor.

No. 02 B 08292.

United States Bankruptcy Court,
N.D. Illinois,
Eastern Division.

June 22, 2004.

David K. Welch, Esq., Crane, Heyman, Simon, Welch & Clar, Chicago, IL, for Debtor.

Alycia A. Fitz, Esq., Law Offices of Colleen M. McLaughlin, Wheaton, IL, for Movant David J. Azarela.

## MEMORANDUM OPINION

JOHN H. SQUIRES, Bankruptcy Judge.

This matter comes before the Court on the motion of David J. Azarela ("Azarela") for allowance of post-petition administrative expenses while employed by Pre–

Press Graphics Company, Inc. (the "Debtor"). Azarela claims that pursuant to the provisions of an alleged employment agreement with the Debtor, he is entitled to the payment of $23,461.28, which he asserts is a post-petition priority expense of administration under 11 U.S.C. § 503(b)(1)(A) and § 507(a)(1). For the reasons set forth herein, the Court denies Azarela's motion. The objection thereto lodged by the Debtor is sustained.

## I. *JURISDICTION AND PROCEDURE*

The Court has jurisdiction to entertain this matter pursuant to 28 U.S.C. § 1334 and Internal Operating Procedure 15(a) of the United States District Court for the Northern District of Illinois. This matter constitutes a core proceeding under 28 U.S.C. § 157(b)(2)(A),(B) and (O).

## II. *FACTS AND BACKGROUND*

The Debtor is engaged in the graphic arts and printing business. On March 4, 2002, the Debtor filed a voluntary petition under Chapter 11. Previously, Azarela was employed by Vertis, Inc. ("Vertis") for several years as an account manager/salesman. On October 10, 2001, Azarela and Vertis entered into a Separation and Release Agreement (the "Release Agreement") pursuant to which Azarela's employment with Vertis was terminated.[1] Specifically, the Release Agreement prohibited Azarela from soliciting any custom-

ers of Vertis for a twelve-month period following his termination through a non-compete clause (the "Non–Compete Clause").

In late March or early April 2002, Azarela met with David Nolte ("Nolte"), vice president of sales for the Debtor and a former colleague from their prior employment at Vertis, regarding Azarela's potential employment with the Debtor. Azarela Ex. No. 1. The Debtor's president, Robert Beevers ("Beevers"), also briefly attended the meeting. Thereafter, on April 10, 2002 Nolte sent Azarela an e-mail message with the subject heading "employment proposal." Debtor Ex. J; Azarela Ex. No. 2. Attached thereto was a proposal with respect to Azarela's prospective employment with the Debtor. Azarela Ex. No. 2; Debtor Exs. A and J. Subsequently, on April 17, 2002, Nolte sent Azarela another copy of the April 10, 2002 letter with handwritten notations on the bottom. Azarela Ex. No. 3; Debtor Ex. B. The typewritten portion of the letter thanked Azarela for considering a sales career with the Debtor and set forth several proposed terms including: an employment term of a minimum of nine months; biweekly draw based on $60,000.00 annually; that Azarela target new clients and previous clients per his sales strategy outline (Azarela Ex. No. 4); the sales expectations the Debtor had for Azarela; and the promise to provide Azarela with sales

---

1. The Release Agreement was offered into evidence as Debtor's Ex. C, but the Court reserved ruling on whether the document should be admitted in its entirety, as the Debtor argues, or in a redacted form, as Azarela contends. The Court finds that the Release Agreement is not outcome determinative of the ultimate issue at bar: whether Azarela's claim should be afforded administrative expense priority status. First, neither version was timely submitted to the Court in compliance with the Court's Final Pretrial Order

that required advance submission of all exhibits. *See* Fed. R. Bankr.P. 7016 and 7037; *In re Maurice,* 21 F.3d 767 (7th Cir.1994). Moreover, the pertinent provisions of the Release Agreement are undisputed and were brought out in relevant testimony. Thus, admission of the exhibit would be superfluous, cumulative and unnecessary under Federal Rule of Evidence 403. Accordingly, the Release Agreement is not admitted into evidence.

support to insure his "client's [sic] expectations" were met. Azarela Ex. No. 3; Debtor Ex. B. The April 17, 2002 letter specifically outlined the Debtor's sales expectations for the first six months of Azarela's employment: first month—$0 sales; second month—$15,000.00; third month—$25,000.00; fourth month—$35,000.00; fifth month—$40,000.00; and sixth month—$50,000.00 and beyond. *Id.*

The handwritten notations on the April 17, 2002 letter, which were made by Nolte and inserted below the typewritten portion, included a phone allowance of $150.00 per month for the first six months and a car allowance of $400.00 per month for the first six months. *Id.* Additionally, the letter provided under the heading of "Pay," that Azarela was to receive $1,500.00 per week for the first three month period; $1,150.00 per week for the second three month period; and $811.52 per week for the final three month period. *Id.* Finally, at the bottom of the letter was the handwritten notation "9 Month (Mutual) Contract." *Id.* It is undisputed that there was no formal employment contract signed by Azarela or the Debtor.

On May 6, 2002, Azarela began working for the Debtor as an account manager who was to make sales for and on behalf of the Debtor. Approximately five month later on October 10, 2002, Azarela was fired. Beevers testified that he fired Azarela due to his failure to make any sales for the Debtor. Azarela testified that many of the sales contacts he approached during his employment with the Debtor were the same contacts he had at Vertis, and were thus covered by the Non–Compete Clause in the Release Agreement. Debtor Exs. F, G & I.

Beevers stated that he met with Azarela prior to his October 10, 2002 termination date and informed Azarela that his pay was being reduced from $2,300.00 to $500.00 because of his failure to make any sales. Beevers testified that the $500.00 figure was to cover Azarela's expenses associated with his efforts to gain business from potential clients. Beevers further testified that he did not expect Azarela to make sales immediately upon commencement of his employment, but did expect to see sales within 30–90 days after being hired. Additionally, Beevers stated that he expected sales quotes to be sent to potential customers by all salespersons. He testified that Azarela sent only one quote to a potential customer which never materialized into any business for the Debtor. No other quotes were generated by Azarela. Beevers testified that of the eleven salespersons employed by the Debtor during the time of Azarela's employment, all made sales for the Debtor except Azarela. Finally, Beevers maintained that Azarela never told him about the Non–Compete Clause in the Release Agreement. Azarela testified that he disclosed the existence of the Non–Compete Clause to both Nolte and Beevers, but his testimony was uncorroborated.

Kinzie Thomas ("Thomas"), the Debtor's human resources manager and corporate secretary, testified that she is the individual responsible for collecting timekeeping reports, processing the payroll for the salespersons, preparing termination memoranda and calculating any salary, commissions, expenses and vacation time that would be due to Azarela with respect to his termination. Thomas stated that she prepared Azarela's paychecks, and made the determination as to how to record these payments in the Debtor's books based on information she received from Nolte. Azarela Ex. No. 29. Thomas recorded the payments to Azarela in the Debtor's commission payment ledger. Debtor Ex. D; Azarela Ex. No. 32. All of Azarela's biweekly payments were recorded as draws

against future earned commissions, not as salary or wage payments. *Id.* Additionally, Thomas testified that all employees were required to punch a time clock, but Azarela often failed to do so. Debtor Ex. H. Further, all employees were required to work from the office, but Azarela often did not come to the office. *Id.* Finally, Thomas stated that employees were required to prepare expense reports in order to receive expense reimbursement, but Azarela rarely prepared such reports.

On September 4, 2003, Azarela filed the instant matter, a request for payment of administrative expenses under § 503(b)(1)(A) and § 507(a)(1). Azarela contends that the Debtor owes him $23,461.28, which is comprised of unpaid wages, phone and car allowance. Azarela Ex. No. 30; Debtor Ex. E. In addition, Azarela contends that the Debtor breached the employment agreement, violated the Illinois Wage Payment and Collection Act, 820 ILCS 115/1 *et al*, is liable for punitive damages under the Illinois Minimum Wage Law, 820 ILCS 105/12(a), and is liable for Azarela's attorney's fees under the Attorneys Fees in Wage Actions Act, 705 ILCS 225/1.

The dispute between the parties focuses on several principal issues: (1) whether there was an employment agreement between the Debtor and Azarela; (2) if there was such an employment agreement, whether Azarela was "guaranteed" certain monetary compensation thereunder; (3) whether the debt arose from a transaction with the Debtor; and (4) whether there was any benefit to the Debtor's business operations. The Court will address each issue in turn.

### III. *DISCUSSION*

#### A. *Employment Contracts in Illinois*

Azarela contends that the April 17, 2002 letter was a contractual offer of salaried employment with a duration of nine months. The Debtor does not dispute that Azarela was hired on May 6, 2002. The Debtor contends, however, that there was no written employment contract executed by it or Azarela and that his compensation was in the nature of a non-guaranteed draw against future commissions earned on sales he generated.

■ Initially, the Court must determine whether the April 17, 2002 letter from Nolte to Azarela was sufficiently clear and definite to constitute a contractual offer. "A contract, to be valid, must contain offer, acceptance, and consideration; to be enforceable, the agreement must also be sufficiently definite so that its terms are reasonably certain and able to be determined." *Halloran v. Dickerson*, 287 Ill. App.3d 857, 867–68, 223 Ill.Dec. 323, 679 N.E.2d 774, 782 (5th Dist.1997) (*citing Ogle v. Hotto*, 273 Ill.App.3d 313, 319, 210 Ill.Dec. 13, 652 N.E.2d 815, 819 (5th Dist. 1995)); *see also Church Mut. Ins. Co. v. Mount Calvary Baptist Church (In re Mount Calvary Baptist Church)*, 162 B.R. 181, 184 (Bankr.N.D.Ill.1993) (citation omitted). More specifically, an enforceable agreement exists when the following requirements have been satisfied: competent parties, valid subject matter, legal consideration, mutuality of obligation, and mutuality of agreement. *Longview Aluminum, L.L.C. v. United Steel Workers of Am.*, 213 F.Supp.2d 876, 879–80 (N.D.Ill. 2002) (citation omitted). Finally, there must be a meeting of the minds about the existence of a contract, as well as its terms. *Mount Calvary Baptist Church*, 162 B.R. at 184 (citation omitted).

■ For a valid contract to exist, an offer must be so definite as to its material terms or require such definite terms in the acceptance that the promises and performances to be rendered by each party are

reasonably certain. *Academy Chi. Publishers v. Cheever,* 144 Ill.2d 24, 29, 161 Ill.Dec. 335, 578 N.E.2d 981, 983 (1991) (citations omitted). To be validly exercised, an acceptance must meet and correspond to the exact terms of the offer. *Morris v. Goldthorp,* 390 Ill. 186, 195, 60 N.E.2d 857, 861 (1945) (citations omitted). "A contract is sufficiently definite and certain to be enforceable if the court is able from its terms and provisions to ascertain what the parties intended, under proper rules of construction and applicable principles of equity." *Halloran,* 287 Ill.App.3d at 868, 223 Ill.Dec. 323, 679 N.E.2d at 782 (*citing Midland Hotel Corp. v. Reuben H. Donnelley Corp.,* 118 Ill.2d 306, 314, 113 Ill.Dec. 252, 515 N.E.2d 61, 65 (1987)). "A contract may be enforced even though some contract terms may be missing or left to be agreed upon, but if essential terms are so uncertain that there is no basis for deciding whether the agreement has been kept or broken, there is no contract." *Halloran,* 287 Ill.App.3d at 868, 223 Ill.Dec. 323, 679 N.E.2d at 782 (*citing Academy Chi. Publishers,* 144 Ill.2d at 30, 161 Ill.Dec. 335, 578 N.E.2d at 984).

■ Contrary to the argument of the Debtor,[2] the Court finds that the April 17, 2002 letter from Nolte to Azarela constituted a bona fide offer of employment between the Debtor and Azarela. First, it is undisputed that Nolte, as vice president of sales for the Debtor, was an agent of the Debtor and had the authority to act on behalf of the Debtor. The language of the April 17, 2002 letter sets forth terms sufficiently clear and definite to cause a reasonable person to believe that an offer had been made. Specifically, the letter thanked Azarela for considering a career with the Debtor and set forth certain terms of an employment relationship such as the duration, the rate of compensation,[3] allowances for car and phone usage, and expected sales levels to be achieved. Hence, the Court concludes that the April 17, 2002 letter from Nolte to Azarela constituted an offer from the Debtor to Azarela for employment.

Azarela testified that he accepted the terms of the employment offer contained in the April 17, 2002 letter and began to work for the Debtor on May 6, 2002. Azarela's commencing work for the Debtor constituted consideration for the promises made in the April 17, 2002 letter. While the Court is able to ascertain many of the terms of the agreement: the duration; the phone allowance; the car allowance; and the sales expectations, not all of the terms of the agreement are precisely clear. In particular, the parties dispute the nature of the compensation to be paid to Azarela. Nevertheless, the Court finds that the April 17, 2002 letter was an employment agreement between the Debtor and Azarela.

■ In Illinois, all employment relationships without fixed durations are presumed to be at-will and are terminable by either party with or without cause. *Robinson v. Ada S. McKinley Comty. Servs., Inc.,* 19 F.3d 359, 360 (7th Cir.1994) (*citing Duldulao v. St. Mary of Nazareth Hosp. Ctr.,* 115 Ill.2d 482, 489, 106 Ill.Dec. 8, 505 N.E.2d 314, 317 (1987)); *Kelsay v. Motorola, Inc.,* 74 Ill.2d 172, 189, 23 Ill.Dec. 559,

---

**2.** The Court rejects the Debtor's argument that because the correspondence between Azarela and Nolte were not signed, they could not constitute employment contracts. The signature of either or both parties is not a prerequisite to the creation of a valid, enforceable employment contract.

**3.** The exact nature of the compensation to be paid as either a salary or a draw against commissions, however, is not clear from the letter and will be discussed later.

384 N.E.2d 353, 360 (1978) (citation omitted). As a rule of construction, the employment at will rule mandates only a presumption that hiring without a fixed term is at will. *Duldulao*, 115 Ill.2d at 489, 106 Ill.Dec. 8, 505 N.E.2d at 318. That presumption can be overcome by demonstrating that the parties contracted otherwise. *Id.* Where an employment contract is for a fixed term, the employment is not at will, and discharge can only be for cause. *See Berutti v. Dierks Foods, Inc.*, 145 Ill. App.3d 931, 934–35, 99 Ill.Dec. 775, 496 N.E.2d 350, 352–53 (2d Dist.1986) (citations omitted); *Grauer v. Valve & Primer Corp.*, 47 Ill.App.3d 152, 154–55, 5 Ill.Dec. 540, 361 N.E.2d 863, 865 (2d Dist.1977) (citation omitted).

■ The Court finds that the April 17, 2002 letter from Nolte to Azarela constituted an employment contract with a fixed duration. The letter specifically provided under one of the typewritten bullets that the employment term was "a minimum of nine months." Azarela Ex. No. 3; Debtor Ex. B. In addition, the letter provided in handwriting at the bottom "9 Month (Mutual) Contract." *Id.* Because the employment contract between the Debtor and Azarela was for a fixed duration, under Illinois law, the Debtor could terminate Azarela only for cause.

■ The Court further finds that the Debtor in fact properly terminated Azarela for cause. Beevers testified that he fired Azarela on October 10, 2002, prior to the nine month expiration date, because he failed to make any sales for the Debtor. The sales expectations were clearly set forth in the April 17, 2002 letter. It is undisputed that Azarela never made any sales for the benefit of the Debtor. The Non–Compete Clause in the Release Agreement prohibited Azarela from soliciting any customers of Vertis for a twelve-month period following his termination.

Azarela was bound by the Non–Compete Clause in favor of Vertis while in the employ of the Debtor. Indeed, many of Azarela's sales contacts were customers of Vertis and thus Azarela was prohibited from soliciting business from them. Beevers testified that he was wholly unaware of the existence of the Non–Compete Clause in the Release Agreement prior to Azarela being hired by Nolte.

Next, the Court must address the issue of Azarela's compensation. Azarela argues that he was guaranteed specific compensation under the employment agreement. To the contrary, the Debtor argues that any biweekly payments made to Azarela were advances or a draw against his future earned commissions, and because Azarela never made any sales or earned any commissions, he is not owed any further compensation and should be ordered to refund all draws paid to him.

■ The initial focal point of any contract analysis is the language in the contract itself. *Much v. Pac. Mut. Life Ins. Co.*, 266 F.3d 637, 643 (7th Cir.2001) (citation omitted); *Church v. Gen. Motors Corp.*, 74 F.3d 795, 799 (7th Cir.1996). State law determines the rules governing contract interpretation. *N. Shore Gas Co. v. Salomon Inc.*, 152 F.3d 642, 652 (7th Cir.1998) (citations omitted). The Court looks to Illinois law in construing the contractual provision at issue here.

■ Illinois courts use the "four corners" approach to contract interpretation, confining their attention to only that which appears within the four corners of the relevant documents. *Bourke v. Dun & Bradstreet Corp.*, 159 F.3d 1032, 1036 (7th Cir.1998) (citation omitted); *see also Neuma, Inc. v. AMP, Inc.*, 259 F.3d 864, 873–74 (7th Cir.2001) (citation omitted) (finding that if a contract is unambiguous, a court "will not look beyond its 'four corners' in

interpreting its meaning"). If the language of a contract can be interpreted in only one way, the case is over. *AM Int'l, Inc. v. Graphic Mgmt. Assocs., Inc.*, 44 F.3d 572, 574 (7th Cir.1995) (citations omitted). In interpreting contracts, the overriding concern is to give effect to the intent of the parties. *Church*, 74 F.3d at 799 (citation omitted).

The Court's first task is to decide whether the contractual document at issue is ambiguous or unambiguous. It is well established that this determination is a question of law. *Houben v. Telular Corp.*, 231 F.3d 1066, 1072 (7th Cir.2000) (citation omitted); *Tingstol Co. v. Rainbow Sales Inc.*, 218 F.3d 770, 772 (7th Cir.2000) (citations omitted); *Anstett v. Eagle–Picher Indus., Inc.*, 203 F.3d 501, 503 (7th Cir. 2000).

A contract is ambiguous if the language used is susceptible to more than one reasonable interpretation. *Thomas v. Pearle Vision, Inc.*, 251 F.3d 1132, 1137–38 (7th Cir.2001) (citations omitted); *Bourke*, 159 F.3d at 1036 (citation omitted) ("In Illinois, '[a]n instrument is ambiguous only if the language used is reasonably or fairly susceptible to having more than one meaning . . . .' "); *Cent. States, S.E. & S.W. Areas Pension Fund v. Kroger Co.*, 73 F.3d 727, 732 (7th Cir.1996) (citations omitted) ("When parties suggest different, yet reasonable interpretations of a contract, the contract is ambiguous."); *Murphy v. Keystone Steel & Wire Co.*, 61 F.3d 560, 565 (7th Cir.1995) (citation omitted) ("[A] contract is ambiguous only if both parties were reasonable in adopting their different interpretations of the contract."). However, a contract is not rendered ambiguous merely because the parties disagree on the meaning of its terms. *Interim Health Care of N. Ill., Inc. v. Interim Health Care, Inc.*, 225 F.3d 876, 879 (7th Cir.2000) (citation omitted).

A contract that is susceptible to only one reasonable interpretation is unambiguous, and a court must determine its meaning as a matter of law. *Moriarty v. Svec*, 164 F.3d 323, 330 (7th Cir.1998) (citation omitted); *Murphy*, 61 F.3d at 565 (citation omitted). Where a contract's provisions are clear, a court will enforce them according to their ordinary and plain meaning. *Interim Health Care*, 225 F.3d at 879 (citation omitted); *Grun v. Pneumo Abex Corp.*, 163 F.3d 411, 420 (7th Cir. 1998) (citation omitted) ("Courts must interpret the express terms of a [contract] 'in an ordinary and popular sense as would a person of average intelligence and experience . . . .' "); *Bourke*, 159 F.3d at 1036 (citation omitted) (" 'The terms of an agreement, if not ambiguous, should be generally enforced as they appear, and those terms will control the rights of the parties.' ").

Further, a contract must be construed as a whole; that is, sentences must not be read in isolation, as each takes meaning from others in the same document. *Bourke*, 159 F.3d at 1038 (citation omitted). Courts presume that each provision in a contract was inserted deliberately and for a reason. *Atl. Mut. Ins. Co. v. Metron Eng'g & Constr. Co.*, 83 F.3d 897, 900 (7th Cir.1996) (citation omitted). Finally, courts will not add language to an agreement, nor add words or terms to a contract, to change its plain meaning. *Grun*, 163 F.3d at 420 (citation omitted) ("[W]hen a contract is unambiguous, '[w]e refuse to indulge in judicial activism' by 'constru[ing] the [contract] beyond its clear and obvious language . . . .' "); *Sheehy v. Sheehy*, 299 Ill.App.3d 996, 1001, 234 Ill. Dec. 34, 702 N.E.2d 200, 204 (1st Dist. 1998). *See also Caisse Nationale de Credit Agricole v. CBI Indus., Inc.*, 90 F.3d 1264, 1273 (7th Cir.1996) (declining the

"invitation" to add terms to the agreement at issue in order to decipher its silence).

Applying these well established contract principles, the threshold inquiry is whether the April 17, 2002 letter is clear or ambiguous regarding Azarela's compensation. The Court begins by examining the relevant language in the letter.

The parties on both sides urge that the language in the document is unambiguous and bolsters their own interpretation. While both sides may be wrong, both cannot be right. *See Bourke,* 159 F.3d at 1037. If the Court finds that one suggested construction is reasonable, a determination must be made as to whether the other interpretation is also reasonable. *See id.* If it is, then the language used is fairly susceptible to more than one meaning, and the contractual documents are ambiguous. *Thomas,* 251 F.3d at 1137–38 (citations omitted).

The Court finds that the language in the April 17, 2002 letter is ambiguous regarding the issue of whether Azarela was to be paid a salary or merely a draw against future earned commissions. First, the letter itself uses the term "draw" not "salary" or "wages." The April 17, 2002 letter specifically provided that Azarela was to receive "biweekly *draw* based on $60,000.00 annually." Azarela Ex. No. 3; Debtor Ex. B (emphasis added). Further, the letter provided under the heading of "Pay," that Azarela was to receive $1,500.00 per week for the first three month period; $1,150.00 per week for the second three month period; and $811.52 for the final three month period. *Id.* Azarela testified that he understood the pay arrangement to constitute that of a biweekly salary. Thomas, however, testified that she recorded the payments to Azarela in the Debtor's ledger book as payments against future earned commissions. Beevers' testimony supported that

position. Based upon the conflicting testimony and the fact that the language in the letter is not clear, the Court finds that the April 17, 2002 letter is ambiguous. Hence, the Court finds that Azarela failed to demonstrate by a preponderance of the evidence that the Debtor "guaranteed" him a certain salary and that he is owed any further wages or salary above what he previously received and was paid as a "draw."

The Debtor argues that because the compensation paid to Azarela was a draw or an advance against his future earned commissions, and Azarela never earned any commissions due to his failure to make any sales, he should be required to return any monies paid to him. In Illinois, courts have held that an employee is not liable to repay an employer for unearned advances that were to be charged against future earned commissions unless the employer and employee expressly agreed that the employee was to be personally liable. *Steger v. Lappin,* 119 Ill.App.2d 146, 149, 255 N.E.2d 87, 89 (2d Dist.1970) (citation omitted); *Elec. Supply Corp. v. Meyrick,* 349 Ill.App. 383, 385–86, 110 N.E.2d 525, 526 (1st Dist.1953) (citation omitted). Advances to an employee will be presumed to constitute minimum compensation. *Steger,* 119 Ill.App.2d at 149–50, 255 N.E.2d at 89 (citations omitted). The burden to show a contrary intent is on the party seeking repayment. *Id.* at 150, 255 N.E.2d at 89 (citations omitted). The rationale behind the general rule is that:

> [T]he employee's undertaking is in the nature of a joint enterprise with the employer, the main object of which is the employer's business, and it is not to be assumed that the employee, in furnishing his time and ability, is to assume all risk. Consideration is also given to the assumption that an employer has

superior bargaining power which imposes upon him the duty to make the return of previously transferred funds a matter of explicit contract, recognizing a judicial reluctance to cause forfeiture of money already received.

*Id.*

■■■ The Court rejects the Debtor's argument that Azarela should be required to return any monies received by him during his employment with the Debtor. The Debtor failed to establish the existence of any express agreement between it and Azarela whereby Azarela would be personally liable for the return of any monies he received. Neither the April 17, 2002 letter nor any other exhibit supports the argument that Azarela owes the Debtor a refund of the compensation paid to him for his unavailing sales efforts. Absent any evidence of such an agreement between the parties, the Court concludes that all monies paid to Azarela by the Debtor constituted minimum compensation to Azarela for services performed during the course of his employment.

### B. *Standards for Administrative Expense Allowances*

An expense of administration claim is governed by § 503(b) and provides in relevant part:

> (b) After notice and a hearing, there shall be allowed administrative expenses ... including—
>
> (1)(A) the actual, necessary costs and expenses of preserving the estate, including wages, salaries, or commissions for services rendered after the commencement of the case.

11 U.S.C. § 503(b)(1)(A).

■■■ Administrative priority claims are to be strictly construed because the presumption in bankruptcy cases is that the debtor has limited resources that will be equally distributed among creditors. *See In re Amarex, Inc.*, 853 F.2d 1526, 1530 (10th Cir.1988) (citations omitted). The policy underlying priority treatment for administrative expenses is to encourage creditors to extend credit to debtors which will enable a reorganization to succeed. *See In re Jartran, Inc.*, 732 F.2d 584, 586 (7th Cir.1984). To that end, in order to demonstrate the priority of an administrative claim, the debt must (1) arise out of a transaction with the debtor-in-possession and (2) benefit the operation of the debtor's business. *Id.* at 586–87 (*citing In re Mammoth Mart, Inc.*, 536 F.2d 950, 954 (1st Cir.1976)); *In re Pre-Press Graphics Co.*, 287 B.R. 726, 730 (Bankr.N.D.Ill.2003).

■■■ In administrative wage claims the amount claimed as compensation for the services must be found to be reasonable. Section 503(b)(1)(A) does not impose a statutory maximum on administrative wage claims. The courts have, thus, policed against excessive wage claims by demanding that the claim not be disproportionate to the value of the services rendered. *See* 2 W. Norton Jr., *Norton Bankruptcy Law and Practice 2d*, § 42:18 at p. 42–101 (2d ed.1994). *See also In re Chi. Lutheran Hosp. Ass'n*, 75 B.R. 854, 857 (Bankr.N.D.Ill.1987) (post-petition wage related claims are entitled to be treated as first priority administration claims under § 503(b)(1)(A) and § 507(a)(1)). Hence, Azarela has the additional burden to establish that his alleged administrative wage claim is reasonable and not disproportionate to the value of the actual services he rendered to the Debtor's estate.

The Court finds that the first element of the *Jartran* test has been met. The employment agreement and subsequent employment relationship between Azarela and the Debtor was a postpetition transac-

tion. The Debtor filed its bankruptcy petition on March 4, 2002 and the employment relationship between Azarela and the Debtor did not commence until May 6, 2002. In fact, Azarela testified that he met with Nolte in late March or early April 2002 regarding Azarela's prospective employment with the Debtor. Undisputedly, this transaction with the Debtor arose post-petition.

With respect to the second element of the *Jartran* test, the Court finds that the services rendered by Azarela after the commencement of the bankruptcy case did not benefit the operation of the Debtor's business. It is undisputed that Azarela failed to make any sales or bring in any business for the Debtor. Azarela sent only one quote to a potential customer that never materialized into a sale for the Debtor's benefit. While Azarela may have actively attempted to achieve sales for the Debtor, the undisputed fact remains that he was the only salesperson employed by the Debtor who made no sales during his employment period. Further, the Court finds that Azarela failed to establish that his alleged administrative wage claim is reasonable and not disproportionate to the value of the actual services rendered to the Debtor's estate. Indeed, Azarela made no sales for the benefit of the Debtor during his five months of employment. To award Azarela any amount in addition to what he has already been paid would be disproportionate to the value of the service he performed. The Court finds that there was no further monetary value to the Debtor from any services rendered by Azarela as a salesman for the Debtor. Accordingly, the Court denies Azarela's request for payment of post-petition administrative expenses.

## C. The Debtor's Alleged Violations of Illinois Law

Lastly, Azarela contends that the Debtor violated the employment contract by unilaterally reducing his weekly salary or draw in August and September 2002; by terminating him before the contract expired; and by not paying him for six months of his car allowance and six months of his cell phone allowance. Further, Azarela argues that the Debtor wrongfully reduced his wages from $1,150.00 per week to $250.00 per week; reduced his wages from $250.00 per week to zero; and failed to pay final compensation due him on October 4, 2002 or within the next pay period, all in violation of the Illinois Wage Payment and Collection Act. Additionally, Azarela argues that the Debtor is liable for punitive damages under the Illinois Minimum Wage Law as well as his attorney's fees under the Attorneys Fees in Wage Actions Act as a result of these alleged employment contract violations.

Azarela's arguments are not controlling and have no relevance with respect to whether the Court should allow his claim as an administrative expense under § 503(b)(1)(A) and § 507(a)(1). Whether or not the Debtor violated the Illinois Wage Payment and Collection Act or the Minimum Wage Law are not issues the Court need consider in the context of Azarela's motion for payment of post-petition administrative expenses. The real focus before the Court is whether Azarela's claim, in any amount, should be afforded priority status as an expense of administration. The Debtor's alleged violations of Illinois law are irrelevant for purposes of making a determination as to whether Azarela's claim should be granted administrative priority pursuant to the Bankruptcy Code.

## IV. CONCLUSION

For the foregoing reasons, Azarela's motion is denied, and the objection thereto by

the Debtor is sustained. Azarela's claim is disallowed as a post-petition priority expense of administration under § 503(b)(1)(A) and § 507(a)(1).

This Opinion constitutes the Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052. A separate order shall be entered pursuant to Federal Rule of Bankruptcy Procedure 9021.

## ORDER

For the reasons set forth in a Memorandum Opinion dated the 22nd day of June 2004, the Court denies the motion of David J. Azarela pursuant to 11 U.S.C. § 503(b)(1)(A) and § 507(a)(1) for allowance of post-petition administrative expenses in the sum of $23,461.28. The objection thereto lodged by Pre–Press Graphics Company, Inc. is sustained.